United States District Court
Middle District of Florida
Ocala Division

Angel E. Gastón
Plaintiff

Case No.: 5:22-CV-409-WFJ-PRL

V.

City of Leesburg, et al.
Defendant(s)

FILED - USDC - FLMD - OCA
AUG 4 2025 PM12:35

## Plaintiff Responce to Defendants Motion to Dismiss/strike the Amended Complaint with Prejudice.

I, Angel E. Gastón (the Plaintiff in the above styled cause) come before this court in responce to the motion to dismiss by defendants: City of Leesburg ("city"), City of Leesburg Chief of Police ("Police Chief"), Nicholas M. Bomanelli ("Bomanelli"), John G. Sommersdorf ("Sommersdorf"), Dominic Paonessa ("Paonessa"), John Liston ("Liston"), Joseph Iozzi ("Iozzi"), Daniel Navarro ("Navarro"), Charles Ketchum ("Ketchum"), Gustavo Escalante ("Escalante"), David Carver ("Carver"), Stefano Dagostino ("Dagostino"), Eric W. Lamoreaux ("Lamoreaux") and Allen Carter ("Carter") (here collectively known as "defendants") — Plaintiff Responce to court document 118 —. The defendants make this motion pursuant to rules 8, 10, and 12 of the Federal Rules of Civil Procedure ("FRCP").

Pg. 1 of 126

# Plaintiff Responce Table of Content

A.) Motion to Dismiss Review — p.g. 3

B.) Outline of responce to motion to Dismiss — p.g. 3

C.) Causes of Action and Defendant Liability — p.g. 4

D.) Memorandum of Law for Section "B" above — p.g 6

    I.) Notice of Intent — p.g. 6

    II.) Federal Rules of Civil Procedure (FRCP) rules 8, 10, and 12 — p.g. 6

        A.) Stating a claim — p.g. 7

        B.) Shotgun Pleading — p.g 11

        C.) Conclusions of Law — p.g. 15

        D.) Summary of Facts — p.g. 18

        E.) Color of Law — p.g. 22

    III.) Immunity and Probable Cause — p.g. 23

        A.) Qualified Immunity — p.g. 23

        B.) Probable Cause — p.g 37

        C.) Police officer Duty of Care — p.g. 44

        D.) Discretionary Vs. Operational Acts — p.g 49

        E.) Separation of Powers Doctrine — p.g. 60

    IV.) Legal Duty by the City — p.g. 64

    V.) False Arrest Claim — p.g. 78

    VI.) Disputed Material Facts from Defendants — p.g. 82

        A.) My testimony — p.g. 82

        B.) Disputes over Baker Act report by Paonessa — p.g. 85

        C.) Dispute over Dagostino's Affidavit and Sommersdorf Affidavit. — p.g. 85

        D.) Dispute over Carter's Affidavit — p.g. 87

        E.) Dispute over Escalante's Affidavit and Liston's Affidavit — p.g 91

        F.) Dispute over Lamoreaux's Affidavit — p.g. 92

        G.) Dispute over Romanelli's Affidavit and Iozzi's Affidavit — p.g 101

    VII.) First Amendment Retaliation — p.g. 108

    VIII.) Punitive Damages — p.g. 123

    IX.) Conclusion — p.g. 124

A) <u>Motion to Dismiss Review</u>

As grounds for the motion to dismiss, the defendants state the following:

I.) The Plaintiff's state law claims are barred for failure to comply with Section 768.28, Florida Statutes.

II.) Under Fed. R. Civ. Pro. rules 8, 10, and 12(b)(6); the Plaintiff's amended Complaint fails to state a claim generally and fails to properly separate Complaint into Counts.

III.) The officers are entitled to qualified immunity under Federal and law (42 U.S.C. § 1983); Fla. Stat § 768.28

IV.) Plaintiff's Negligence claims also fail to Allege a legal duty owed by the City.

V.) Plaintiff's "False Arrest" claim fail under State and Federal law.

VI.) Plaintiff's claim for Punitive damages should be stricken.

B.) <u>Outline of Responce to Motion to Dismiss</u>

In this responce to the defendants motion to dismiss I (the Plaintiff) will present to the Court why the defendants legal Conclusions are incorrect in each of the following sections:

I.) I (the Plaintiff) did send a notice of intent to sue with the claims in the amended Complaint to the City of Leesburg.

II.) I have properly stated a claim with facts in numbered paragraphs, each limited to a single set of Circumstances for which relief can be granted pursuant to FRCP rules 8(a)(2), 10(b), and 12(b)(6).

III.) The defendants choice to Baker Act me was malicious and/or Knowingly done in bad faith, therefore the defendants do not qualify for immunity under either Federal or State law.

IV.) The defendants Created a "special duty" when they chose to take me into their Custody, therefore the City does have a legal duty to adequately train its Police Officers due to the foreseeable risk of harm in placing citizens in Police Custody.

P.g. 3 of 126

**V.)** By Maliciously Baker Acting me in bad faith the defendants violated Fla. Stat. Section 394.463 (5) and therefore violated my rights under the 4th Amendment of the U.S. Constitution by lacking the authority to physically restrain me; also known as a false arrest.

**VI.)** I have stated a valid claim for Punitive damages against the officers in their individual capacity for direct and/or indirect involvement in this complaint

> **Note:** I am not asking for Punitive damages against the city

## C.) Causes of Action and Defendant Liability

The amended complaint (Doc. 18) clearly states causes of action and who is liable for damages.

### 1) City of Leesburg — official capacity:

**A) Federal cause of action**
1 - First Amendment Retaliation (from the official acts of Policymakers)
2 - Civil Conspiracy to deprive me of civil rights
3 - Monell claim of Failure to train and supervise

**B) State Tort**
1 - Tort of Negligent Supervision

### 2) Police Policymakers — Individual capacity:
(Chief of Police—unknown officer #5; Iozzi; and Romanelli)

**A) Federal cause of action**
1 - False Arrest claim
2 - First Amendment Retaliation Claim
3 - Civil Conspiracy to deprive me of civil rights
4 - Monell claim of Failure to train and supervise

pg. 4 of 126

**B.)** <u>State Tort</u>

1- Tort of Negligence
2- Tort of False Arrest
3- Tort of Negligent Supervision
4- Tort of Civil Conspiracy

Note: In the amended complaint (Doc. 18) I do ask the Court for punitive damages against all three Police Policymakers in their individual capacities.

**3) Police Officers — Individual Capacity:**
(Lamoreaux, Carter, Escalante, Carver, Ketchum, Liston, Navarro, Barrett, Paonessa, unknown officer #1, unknown officer #2, and unknown officer #4 (T27))

**A.)** <u>Federal Cause of action</u>

1- False Arrest Claim
2- First Amendment Retaliation Claim
3- Conspiracy to deprive me of civil rights.

**B.)** <u>State Tort</u>

1- Tort of Negligence
2- Tort of False Arrest
3- Tort of Civil Conspiracy.

Note: In the amended complaint I do ask the Court for punitive damages against all of the defendants listed in this section #3.

In my amended complaint (Doc. 18) I presented specific material facts to support each of the claims being presented above. I have separated each cause of action into a different Count and/or claim for relief. I have also been very specific as to which of the defendants are responsible for which acts and/or omissions.

P.9. 5 of 126

With this response to the defendants motion to dismiss, I will reiterate to the Court that the causes of action stated above are viable claims that provide more than the basic pleading requirements of FRCP rules 8(a)(2) and 10(b) against the City of Leesburg, its Police Department Policymakers, and its Police officers.

## D.) Memorandum of Law For Section "B" above

### Introduction

1) The "purpose of §1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."
Lozman V. City of Riviera Beach, 39 F. Supp. 3d 1392 (2014)

## I.) Notice of Intent

1) On 12/7/2023 I sent a notice of intent to sue with the claims in the amended complaint to the City of Leesburg, Attn: Mayor Jimmy Burry, 501 W. Meadow St., Leesburg, FL 34748

2) Let the court note that my amended complaint (Doc. 18) has given defendants adequate and fair notice of the claims against them and the grounds upon which each claim rests.

3) The notice of intent to sue was sent by regular mail due to county jails not offering certified mail services.

## II.) Federal Rules of Civil Procedure (FRCP) rules 8, 10, and 12

I have properly stated a claim with facts in numbered paragraphs, each limited to a single set of circumstances for which relief may be granted pursuant to FRCP rules 8, 10, and 12

Pg. 6 of 126

## A.) Stating a Claim

1.) My amended complaint (Doc. 18) is **not** a set of bare assertions that amount to nothing more than a formulaic recitation of the elements of constitutional violations. I have been very specific in my facts and have gone above and beyond the basic requirements of rule 8(a)(2) by providing the court with not only specific facts, but also evidence that my claims are more than plausible; they are **True.**

2.) The plausibility Standard (also called the "Twombly Test") is "A heightened pleading standard requiring that a plaintiff, in order to survive a motion to dismiss for failure to state a claim on which relief can be granted, must ① state facts that, if **taken as true**, make a plausible (rather than Conceivable) claim, and ②not rely solely on conclusions of law, which are not entitled to the same assumption of truth as factual allegations." Bell Atl. Corp. V. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007)

3.) Under Twombly, the relevant question is whether, assuming the factual allegations are true (which the court must do at this stage of the pleadings), I (the plaintiff) have stated a ground for relief that is plausible.

4.) "Although the plausibility requirement applies to the pleading of 'all' claims... the amount of factual detail that is required in a pleading should vary with the complexity of the claim being asserted. Context determines the level of detail required in a pleading. While simple claims might establish 'plausibility' under the Twombly standard using relatively broad, simple allegations, more complex claims will call for more complex allegations in order to establish 'plausibility.'" 2 James W. Moore, Moore's Federal Practice § 8.04[1][d], at 8-36 (3d ed. 2016)

5.) I, the plaintiff, have stated in my Amended complaint (Doc. 18) that the officers acted in bad faith and with purposeful malice when they used the Baker Act without the need for emergency medical intervention and in retaliation for my "sit in" peaceful protest expression against their unlawful policing practices.

6.) The police officers maliciously used the Baker Act in bad faith as an excuse to deprive me of my freedom without having to face accountability for their actions. In Section V, p.g 22 of their motion to dismiss they provide the excuse for not having any reasons to declare a medical emergency as the officers being "trained Not to report too much detail" because the "forms are considered confidential medical information."

7.) The defendants have erroneously stated in Section V, p.g. 23 of their motion to dismiss that, "The probable cause standard does not apply to Baker Act Confinements." On p.g. 24 they go on to erroneously state that the, "4th Amendment does not apply to plaintiff's Baker Act Confinement."

8.) The defendants are operating under the custom that the probable cause requirements of the search and seizure clause of the 4th Amendment of the U.S. Constitution does not apply to Florida's Baker Act law. That is FALSE.

9.) As S.P. V. State, 331 So. 3d 883 (2022) states: "The Baker Act does not, and could not, categorically preclude the protections of the Fourth Amendment."

10.) On p.g. 24 of the motion to dismiss the defendants falsely claim that I (the plaintiff) have stated that the Baker Act Confinement was lawful; this is FALSE and undermines the entire subject of this complaint, which is that the Baker Act Confinement was unlawfully done by the defendants in bad faith and with malicious intent.

p.g. 8 of 126

11.) These officer defendants used their authority under Color of State law, this does not mean that their authority therefore was lawful. The entire purpose of a § 1983 is to hold individuals and governments accountable for their misuse and/or abuse of Power under Color of State law.

12.) The defendants state (on p.g. 24) that "legal authority is shown by valid process." Except that the defendants did not follow a valid process to declare a medical emergency; which is the entire subject of this complaint. The defendants are attempting to use circular reasoning by stating that because the Baker Act was used it must mean the defendants determination to use the Baker Act was valid. I disagree.

13.) As defendants stated on p.g. 24 of the Motion to dismiss, they are operating under the wrongful custom that the use of the Baker Act is an absolute bar to a claim for false arrest" while still providing authority for an arrest. The entire purpose of § 1983 is to stop governments and their agents from this exact type of unchecked abuse of Power under the Color of State law.

14.) Twombly does not require a court at the motion to dismiss stage to consider whether the factual allegations are probably true. The Supreme Court made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be. See Twombly, 550 U.S. at 555, 127 S. Ct. 1955 ("a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"");

P.g. 9 of 126

*id.*, at 556, 127 S. Ct. 1955 ("[a] well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of these facts is improbable, and that a recovery is very remote and unlikely.")

15) I, the plaintiff, have provided the court above and beyond naked assertions; I have provided factual events and exhibits with evidence which is beyond the requirements of this stage of the pleading, which usually involves only the need to state a claim in a short and plain statement showing that I am entitled to relief in accordance with FRCP rule 8(a)(2).

16) According to *Ashcroft V. Iqbal, 556 U.S. 662 (2009)* this statement of claim "...does not require detailed factual allegations, but demands more than unadorned "The defendant unlawfully harmed me" accusation." (Which, as stated above in number 5, 6, and 12, I have provided.)

17) The main question here is the same question asked by the Supreme Court in *Ashcroft V. Iqbal*; "Did respondent, as the plaintiff in the district court, plead factual matter that, if taken as true, states a claim that [defendants] deprived him of his clearly established constitutional rights?" The answer in my cause is a resounding **YES**.

18) Accepting all of the facts in my amended complaint as true, the court can say that there are more than enough facts to raise a reasonable expectation that discovery will reveal evidence of constitutional violations for which I am entitled to relief against the defendants.

Pg. 10 of 126.

19.) I have followed and exceeded the requirements of rule 8(a)(2) by giving more than a short and plain statement of my claim; and followed rule 10(b) by establishing my claim with facts in numbered paragraphs, each limited to a single set of circumstances.

20.) With all of the facts I have provided it is reasonable to conclude that the defendants violated *Fla. Stat.* § 394.463(5) and my 4th Amendment Constitutional right with the assumption that there would be no consequences for maliciously declaring a false medical emergency in bad faith.

## B) Shotgun Pleadings

1) The defendants state in Section II, p.g. 7 of the motion to dismiss that, "Plaintiff's amended complaint should be stricken or dismissed in its entirety as an impermissible shotgun pleading."

2.) The defendants have pointed out that the Eleventh Circuit has identified a "shotgun" pleading as a complaint that asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

3.) ("The fact that defendants are accused collectively does not render the complaint deficient. The complaint can be fairly read to aver that all defendants are responsible for the alleged conduct.") Kyle K. V. Chapman, 208 F. 3d 940, 944 (11th Cir. 2000)

4.) In my complaint I have clearly stated that I watched the group of police officers coming on to the day shift

p.g. 11 of 126

grouped together (outside of the police station, but behind their police parking gates/fence) in a discussion and/or coming to an agreement right before they (as a group) came out from behind the gate and restrained/arrested me. When they came out, one of the officers had blue medical gloves on so I started recording with my phone because I suspected their intentions to be malicious and in bad faith. I specifically asked, "Why do you have those gloves on?" and received no responce; they just proceeded to restrain me and snatch my phone from my hand and search my car. Therefore, I have accused the group of conspiring to deprive me of my civil rights by falsely and in bad faith declaring a medical emergency in violation of Fla. Stat § 394.463(5) — the unlawful activities relating to examination and treatment.—

5.) For my amended complaint (Doc. 18) I used the Middle District Courts premade pro-se prisoner complaint form for violation of civil rights. My amended complaint is clearly organized to show which facts are in support of which claims for relief.

6.) The counts in my amended complaint were informative and stated claims upon which relief may be granted.

7.) My amended complaint clearly identified (in seperate paragraphs) which constitutional amendments (First and Fourth Amendments) and statutory laws (§ 394.463, Fla. stat) governed which counts.

8.) My amended complaint has followed and in fact exceeded the requirements of FRCP rules 8(a)(2) and rule 10(b), therefore it is not a shotgun pleading.

9.) Shotgun Pleadings, rule 8(a)(2) and rule 10(b) are discussed (in a dissenting footnote) in T.D.S. Inc. v. Shelby Mut.

Ins Co., 760 F. 2d 1520 (11th Cir. 1985) ("The purpose of these rules is selfevident, to require the pleader to present his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading, the Court can determine that evidence which is relevant and that which is not. "Shotgun" pleadings, calculated to confuse the "enemy," and the Court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked, are flatly forbidden by the [spirit], if not the [letter] of these rules.")

10.) My amended complaint was easily discerned by the defendants to see what I am claiming and be able to frame a responsive pleading.

11.) In my amended complaint the court may clearly determine which facts support which claims and that I have stated claims upon which relief may be granted.

12.) My amended complaint does not confuse the defendants or claim any theories for relief not provided by law and/or which can prejudice the defendants case.

13.) My amended complaint has connected the causes of action to the facts, therefore it is not a shotgun pleading.

14.) My amended complaint has given defendants adequate notice of the claims against them and the grounds upon which each claim rests.

Pg. 13 of 126

15) The counts in my amended complaint do not state multiple cause of action per count; they state one set of facts that violated multiple constitutional provisions which (in accordance to rule 10(b)) I have seperated into multiple counts.

16) My amended complaint is nothing like what is described in Chudasama V. Mazda Motor Corp., 123 F. 3d 1353, 1359 n. 9 (11th Cir. 1997) ("finding a shotgun pleading where "a reader of the complaint must speculate as to which factual allegations pertain to which count.")

17) My amended complaint is organized and specific. The reader of my complaint can easily discern precisely what it is that I (the plaintiff) am claiming in each count.

18) My amended complaint specifically states which facts support my claims for relief. One set of facts can violate multiple constitutional provisions

19) All of the facts I have presented in my claim are material to the causes of action for each count, therefore my complaint is not a shotgun pleading.

20) ("The fact that defendants are accused collectively does not render the complaint deficient. The complaint can be fairly read to aver that all defendants are responsible for the alleged conduct.") Kyle K. V. Chapman, 208 F. 3d 940, 944 (11th Cir. 2000)

p.g. 14 of 126

## C.) Conclusions of Law

1.) In the motion to dismiss by the defendants (filed on 5/01/2025), they state that I have merely presented nothing more than labels, conclusions, and formulaic elements of a cause of action using boilerplate statutory or constitutional language that are bald assertions couched as "facts", legal conclusions masquerading as fact or conclusions contradicted by the complaint or its exhibits. Even more defendants state that my amended complaint is vague, conclusory, and they can't tell what actions or omissions were unlawful.

2.) According to 5 C. Wright and A. Miller, Federal Practice and Procedure § 1218, at 267 (3d ed. 2004) ("The Federal rules do not prohibit the pleading of facts or legal conclusions as long as fair notice is given to the parties.")

3.) The facts in my amended complaint have given fair notice of the nature of my complaint and the grounds on which my claim rests by stating in detail how during my 'sit and wait' peaceful protest at the Leesburg Police Station on 8/17/2020, officers maliciously reached an agreement to use the Baker Act to arrest and detain me without probable cause; in violation of my rights under the First, Fourth, and Fourteenth amendments; and in violation of Fla. Stat. § 394.463

4.) This deprivation of liberty is redressable under the due process clause of the Fourteenth Amendment.

5.) According to Weinstein and Distler, Comments on Procedural Reform: Drafting Pleadings Rules, 57 Colum. L. Rev. 518, 520-521 (1957) ("it is virtually impossible logically to

distinguish among 'ultimate facts' 'evidence', and 'conclusions'. Essentially any allegation in a pleading must be an assertion that certain occurrences took place. The pleading spectrum, passing from evidence through ultimate facts to conclusions, is largely a continuum varying only in the degree of particularity with which the occurrences are described."

6) See also Cook, Statements of fact in pleading under the Codes, 21 Colum. L. Rev. 416, 417 (1921) ("There is no logical distinction between statements which are grouped by the courts under the phrases 'statements of fact' and 'conclusions of law.'")

7) FRCP rule 8 was directly responsive to this difficulty. Its drafters intentionally avoided any reference to "facts" or "evidence" or "conclusions". See 5 C. Wright and Miller, Federal Practice and Procedure § 1216, P. 207 (3d ed. 2004) ("The substitution of 'claim showing that the pleader is entitled to relief' for the code formulation of the 'facts' constituting a 'cause of action' was intended to avoid the distinctions drawn under the Codes among 'evidentiary facts', 'ultimate facts', and 'conclusions'...")

8) Charles E. Clark, the "principal draftsman" of the Federal rules put it thus: ("Experience has shown... that we cannot expect the proof of the case to be made through the pleadings, and that such proof is really not their function. We can expect a general statement distinguishing the case from all others, so that the manner and form of trial and remedy expected are clear, and so that a permanent judgment will result.") The New Federal Rules of Civil Procedure: The Last phase — underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure, 23 A.B.A.J. 976, 977 (1937)

P.g. 16 of 126

9.) Bare allegations suffice under a system that "restricts the pleadings to the task of general notice-giving and invests the deposition-discovery process with a vital role in the preparation for trial." Hickman V. Taylor, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L, Ed. 451 (1947).

10.) "The Federal rules replaced fact pleading with notice pleading." Thomson V, Washington, 362 F. 3d 969, 970 (C.A. 7 2004) (Posner J.)

11.) According to Conley V. Gibson, 355 U.S. 45-46, 78 S. Ct. 2 L. Ed. 2d 80 ("In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.")

12.) Judge Clark wrote in Special Pleading in the "Big Case"? In Procedure— The Handmaid of Justice 147, 148 (C. Wright and H. Reasoner eds. 1965) "I fear that every age must learn its lesson that special pleading cannot be made to do the service of trial and that live issues between active litigants are not to be disposed of or evaded on the paper pleadings, i.e., the formalistic claims of the parties. Experience has found no quick and easy short cut for trials in cases generally..."

13.) Nevertheless, my amended complaint (Doc. 18) does not make conclusory allegations; my complaint makes a presumption of a retaliatory motive based on supporting evidence and considering all the facts to deduce a logical consequence from them.

## D.) Summary of Facts

1.) On 8/17/2020 I went to the Leesburg Police department ("LPD") to retreive personal items that had been unlawfuly taken by LPD officers on a previous occassion and to express my critisism of the recent actions taken by the officers.

2.) Two Seperate officers (on two seperate occassions) came to speak with me regarding my presence at the police station. (reference amended complaint Section IV (D)(A)(1-7))

3.) After speaking with both the officers on seperate occassions that morning and confirming both times that I was not breaking the law by doing a "sit and wait" (my peaceful expression and protest against the policing practices of the Police department) until their department opened in the morning; I continued to "sit and wait" without incident. (reference amended complaint Section IV (D)(A)(7-8))

4.) Several hours later, upon a noticible "Shift change" for the Police officers, I was again (for a 3rd time) confronted by a few officers and was told the department was closed. (reference amended complaint Section IV (D)(A)(8-9))

5.) I again reiterated to the officers that I was not breaking the law by choosing to "sit and wait" in peaceful protest until the evidence section of the police department opened. (reference amended complaint Section IV (D)(A)(9))

6.) Moments later I witnessed these officers and several others coming to an agreement within the police gates and then come (as a group) to confront me. (reference amended complaint Section IV (D)(A)(10))

7.) LPD officers then, without warning or probable cause, surrounded me, restrainend, detained and searched me and my vehicle; and deleted my video recording of their actions. (reference amended complaint Section IV (D)(A)(11-19))

P.g. 18 of 126

8.) After this illegal search and seizure, and after my repeated demands to know why I was being arrested, one of the officers in the group stated I was being "Baker Acted". (reference amended complaint section IV (D)(A)(20))

9.) I told the officers they could not Baker Act me because I did not meet the requirements for the Baker Act. My statements were to no avail. (reference amended complaint section IV (D)(A) (20-23)

10.) Iozzi was one of the City of Leesburg Police Policymakers in the group of officers that approved the use of the "Baker Act".

11.) If not for the failure and breach of duty by the City and its police policymakers to adequately train and supervise officers on the proper use of the Baker Act, on avoiding violations of Federal Constitutional or Statutory rights, and on the consequences of violating said rights; I would not have suffered this false arrest and deprivation of my First amendment right to freely express my protest of bad faith policing practices through a 'sit and wait' peaceful demonstration at the police station; or suffered a deprivation of due process of law.

12.) The underlying facts stated above (in #1-11) is the supporting evidence that forms the factual inference in my complaint on which the legal conclusions and logical consequences are based.

13.) Under the circumstances and upon close examination of the facts in the complaint, it is reasonable and plausible to presume that the officers annoyance and frustration with my 'sit and wait' peaceful protest at their department led them to reach an agreement to use the Baker Act to remove me from their property and punish my defiance against their request for me to leave.

14.) According to O'Connor V. Donaldson, Supreme Court of the United States, June 26, 1975, 422 U.S. 563 95 S. Ct. 2486, 45 L. Ed. 2d 396 ("mere public intolerance or animosity cannot constitutionally Justify the deprivation of a person's physical liberty.")

15) Officers did not have any reason to believe that I had a mental illness or impairment and because of said mental illness/impairment, that I posed a threat of harm to myself or others absent treatment.

16) I, the plaintiff, was not given any reason by the officers for why I should be subjected to an involuntary examination through the "Baker Act."

17.) LPD officers used the Baker Act to avoid the lack of probable cause for an arrest and detention to be discussed in criminal court.

18) Because this act (in #6-10 above) was done by a group of officers (including high ranking City Police Policymakers) it can be presumed and/or infered that the police department has a culture and unwritten custom of intentionally misusing ordinances and statutes and/or having practices that violate the constitutional rights of the people they encounter.

19) According to Ashcroft V. Iqbal, 556 U.S. 662 (2009) ("To survive motion to dismiss, complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face; claim has "facial plausibility" when plaintiff pleads factual content that allows court to draw reasonable inference that defendant is liable for misconduct alleged.")

20.) Presumption is ① Something that is thought to be true because it is highly probable. ② A legal inference or assumption that a fact exists because of the known or proven existence of some other fact or group of facts. (Black's Law Dictionary, 11th edition)

21.) Most presumptions are rules of evidence calling for a certain result in a given case.

22.) A presumption shifts the burden of production or persuasion to the opposing party.

23.) "It is essential to a just view of the subject that our notions of the nature of presumptions be precise and distinct. A presumption is a probable consequence, drawn from facts (either certain, or proved by direct testimony), as to the truth of a fact alleged, but of which there is no direct proof. It follows, therefore, that a presumption of any fact is an inference of that fact from others that are known. The word presumption, therefore, inherently imports a conclusion of the judgment; and it is applied to denote such facts or moral phaenomena, as from experience we know to be invariably or commonly connected with some other related fact. A wounded and bleeding body is discovered; it has been plundered; wide and deep foot marks are found in a direction proceeding from the body; or a person is seen running from the spot. In the one case are observed marks of flight, in the other is seen the fugitive, and we know that guilt naturally endeavors to escape detection. These circumstances induce the presumption that crime has been committed; the presumption is a conclusion

P.g. 21 of 126

or consequence from the circumstances. The antecedent circumstances therefore are one thing, the presumption from them another and different one. It is evident, that this kind of reasoning is not peculiar to legal science, but is a logical process common to every subject of human investigations." William Wills, An Essay on the Principles of Circumstantial Evidence 13-14 (1st Am ed Fr. 3d London ed 1852).

## E.) Color of Law

1.) I, the plaintiff, went to the Leesburg Police Department with the intent of retreiving personal items that had been unlawfully taken by LPD officers on a previous occassion and to express my critisism of the recent actions taken by the officers.

2.) The officers used their power under the color of State law to maliciously use the Baker Act to end my 'sit and wait' peaceful protest expression and punish my determination to remain at their police department property until the evidence section opened.

3.) According to Gresham Park Community Organization V. Howell, C.A. 5 (Ga) 1981, 652 F. 2d 1227 ("Action with knowledge of and pursuant to state law is a minimal requirement to satisfy the "under color of state" law test for jurisdiction purpose.

4.) Regarding 42 U.S.C.A. §1983, Smyth V. Lubbers, W.D. Mich. 1975, 398 F. Supp. 777 states the following: ("Under this Section, any person who, under color of law, deprives another of his federal constitutional rights is liable to the injured party at law or in equity, and if a person acts under color of law, it is irrelavant whether the official was acting within or without the scope of his employment by common law standards.")

P.g. 22 of 126

5.) According to David V. City and County of Denver, C.A. 10 (Colo) 1996 ("Under traditional defenition of "acting under color of state law" defendant in § 1983 action must have exercised power possessed by virtue of the state law and made possible only because wrong doer is clothed with authority of state law.")

6.) I, the plaintiff, meet both requirements stated in Hale V. Vance, S.D. Ohio 2003, 267 F. Supp 2d 725 ("In order to succeed on § 1983 claim, plaintiff must prove: ① that he was deprived of right secured by Federal constitution or laws of United States; and ② that he was subjected to this deprivation by person acting under color of state law.")

7.) According to Adickes V. S.H. Kress & Co., U.S. N.Y. 1970, 90 S.Ct. 1589, 398. US ("In order to show that person has acted under color of a statute for purpose of provision of this section affording civil action for deprivation of rights it is essential that he act with knowledge of and pursuant to statute.")

III) Immunity and Probable Cause
Neither the officers nor the city are entitled to immunity from suit under state or Federal law.

A.) Qualified Immunity
1.) The defendants ask the court in Section III, p.g. 12 of the motion to dismiss (filed on 5/01/2025), to dismiss the state law claims contained in my amended complaint (Doc. 18) against the officers because no government official or employee can be held personally liable in tort or named as a party defendant where the official or employee acted within the scope of employment and without malicious purpose. (For the "scope of employment" see remarks in previous section; Color of Law)

P.g 23 of 126

2.) I have stated throughout my amended complaint (Doc. 18) that the officers acted in bad faith and with actual malicious intent when they used the Baker Act to stop and punish my 'sit and wait' peaceful protest expression; arresting, searching, and detaining me without even having arguable probable cause or need for medical emergency.

3.) "To determine whether officer is entitled to qualified immunity from liability on civil rights claim, district court must determine whether plaintiff's allegations, if true, establish a constitutional violation, and whether any constitutional violation was clearly established; if court answers both question in affirmative, then officer is **not** entitled to qualified immunity." Keating V. City of Miami, 598 F. 3d 753 (2010)

4.) According to Florida Statute § 768.28(9)(a) - officers are not immune if they acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights.

5.) According to Jarzynka V. St. Thomas University of Law, 310 F. Supp. 2d 1256 (S.D. Fla 2004) ("Malice, in this context, is best understood as a wrongful act, done intentionally, without just cause or excuse.")

6.) According to Harlow V. Fitzgerald, 457 U.S. 800 (1982) ("By defining the limits of qualified immunity essentially in objective terms, we provide **no** license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts, where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.")

P.g. 24 of 126

7.) ("To meet their burden of showing that a reasonable Public official would have known that his conduct was unlawful, as required to overcome a qualified immunity defense, a § 1983 plaintiff may ... demonstrate that the violation is so obvious that a reasonable state actor would know that what he is doing violates the constitution.") Green V. Butler, C.A. 7 (Ill.) 2005, 420 F. 3d 689

8.) I, the plaintiff, have met my burden of showing that a reasonable officer would not have Baker Acted me by providing the CAD police reports of two other officers who just hours before the incident in my amended complaint, had come in contact with me and because I was not in violation of any laws or a person that met the qualifications for a Baker Act; these officers left me to continue my 'sit and wait' peaceful protest expression until the evidence section of the police department opened and I could collect my wrongfully taken property.

9.) ("Question of qualified immunity from liability under this section is one of reasonableness, i.e. whether reasonable person in shoes of defendant would have known that he was violating another's constitutional rights.") B.C.R. Transport Co., Inc. V. Fontaine, C.A. 1 (mass.) 1984, 727 F. 2d 7

10.) ("Test for qualified immunity is purely objective: immunity shields public officials in sofar as their conduct does **not** violate clearly established statutory or constitutional rights of which reasonable person would have known.") Myers V. Town of Landis, M.D. N.C. 1996, 957 F. Supp. 762

P.g. 25 of 126

11) The officers in my amended complaint (Doc. 18) knowingly violated my rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution; as well as my rights under Florida Statute § 394.463(1)

12) In the amended complaint I have presented LPD officers were deliberately indifferent to the consequences for violating my constitutional rights and my statutory rights.

13) ("Actions taken by local officials are considered "objectively unreasonable," thus defeating application of qualified immunity, if right allegedly violated is clearly established in sufficiently particularized sense at time of actions at issue; as result of this reasonableness test, doctrine of qualified immunity applies to all but plainly incompetent or those who knowingly violate law.") VanLoo V. Braun, E.D. Wis. 1996, 940 F. Supp 1390

14) ("To show that constitutional violation was "clearly established," so as to preclude claim of qualified immunity in civil rights action, plaintiff must demonstrate: ① that a materially similar case has already been decided, giving notice to defendant; ② that a broader, clearly established principle should control the novel facts of Plaintiff's case; or ③ that plaintiff's case fits within the exception for conduct which so obviously violates the constitution that prior case law is unnecessary.") Keating V. City of Miami, 598 F. 3d 753 (2010)

15) The defendants quote Willingham V. City of Orlando, 929 So. 2d 43, 48 (Fla. 5th DCA 2006) as stating: ("The benefit of this immunity is effectively lost if the person entitled to assert it is required to go to trial.")

P.g. 26 of 126

16.) Except that the officers are **not** entitled to qualified immunity in their malicious exercise of statutory power against clearly established constitutional and statutory rights.

17.) <u>Willingham V. City of Orlando</u> also states: ("False arrest" is defined as the unlawful restraint of a person against that person's will.")

18.) <u>Willingham V. City of Orlando</u> also states: ("In a false arrest action probable cause is an affirmative defense to be proven by the defendant.")

19.) The defendants have not even attempted to prove probable cause in their motion to dismiss, because probable cause did not exist.

20.) The defendants erroneously state in Section IV, p.g. 23 of the motion to dismiss (filed on 5/01/2025), that "the probable cause standard does not apply to Baker Act confinements."

21.) In support for the statement above (in #20), the defendants refer to <u>Bright V. Thomas, 754 Fed Appx. 783 (2018)</u>; except that in Bright the court found officers **did** have "arguable probable cause to detain and commit arrestee under Florida's Baker Act."

22.) In support for the statement above (in #20), the defendants refer to <u>Collins V. State, 125 So. 3d 1046 (2013)</u>; except that in Collins the court found "Police officers acted reasonably and in good faith..."; which meets the requirements for arguable probable cause in the Fourth Amendment.

23.) Defendants in this cause (my complaint) are not stating there was arguable probable cause as an affirmative defense for immunity, they are erroneously stating arguable probable cause was not even needed for the use of the Baker Act.

p.g. 27 of 126

24.) J.W. V. State, 313 So. 3d 909 (2021) is a materially similar case that gave notice to the defendants by holding that law enforcement officers could not subject an individual to an involuntary examination for mental illness under Baker Act because nothing indicated mental impairment or that I (the Plaintiff) posed a threat of harm to myself or others absent of treatment; and therefore, officers were not engaged in lawful performance of legal duty.

25.) At no point during my interaction with the defendants on 8/17/2020 did anyone of the defendants indicate to me any reason for why I should be subjected to a medical emergency for a mental examination (Baker Act); and just like in J.W. V. State none of the defendants affidavits give any indication that I was given a reason for the Baker Act or that any family and/or friends were contacted to assist with my alleged mental illness.

26.) In the motion to dismiss by the defendants Document 131-1 (1147) states that for an involuntary examination the person has either refused a voluntary examination or is unable to determine for himself or herself whether an examination is necessary. The defendants in my instant case did not care either way, therefore they did not ask they just maliciously submitted me for the medical emergency mental health examination (Baker Act).

27.) In the motion to dismiss by the defendants Document 131-1 (1148): "Incompetent to consent to treatment means a state in which a person's judgment is so affected by a mental illness... that he or she lacks the capacity to make a well reasoned, willful, and knowing decision concerning his or her medical, mental health, or substance abuse treatment." Nothing in the defendants reports say anything about their efforts to meet even this first part of the qualification requirements.

P.g. 28 of 126

28.) Neither the Police report or the Baker Act form for Law Enforcement in my complaint/case or in the case of J.W. V. State document any mental impairment.

29.) In the motion to dismiss by the defendants the officers give a laundry list of their subjective views of my character and the officers past experiences with me as excuses for declaring a medical emergency for a mental examination. These testimonies, opinions, and/or affidavits on events that happened before and/or after 8/17/2020 are not admissible as evidence to support the decission to declare a medical emergency for a Baker Act on 8/17/2020 and should be stricken from the record.

30.) With these testimonies, opinions, and/or affidavits the defendants have clearly shown where their animosity towards me comes from, and none of it was from my actions on 8/17/2020.

31) In the Field Contact form for Case #20-08-0242, officer Lamoreaux simply states, "Made contact with subject at the Leesburg Police Department." He further makes the generalization that, "Subject displayed behavior and made statements that met criteria for Baker Act." He further states, "Broom Stick and a ball on a rope. Subject continuously swung ball around on a rope." Nothing about this report gives rise to a Medical emergency for an immidiate mental health examination

32) Further in the "Report of Law Enforcement Officer Initiating Involuntary Examination" officer Paonessa

Pg. 29 of 126

Simply states, "Angel was at the Police Station with a stick. He was hitting the fense waiving it arround. He was making obsene statements... Angel appeared to be irate. Angel also made several irrational statements." Nothing about this report gives the circumstances for why the Police suspect that I have a mental illness and due to that illness I am an immidiate threat to others.

33.) Just like in <u>J.W. V. State</u> nothing about these statement indicated that I posed a real and present threat of substantial harm to mine and/or others well-being that could not "be avoided through the help of willing family members or friends or the provision of other services (like the property department returning my property to me) or that there was a "substantial likelihood" that absent treatment I would "cause serious bodily harm to myself... or others in the near future." See § 394.463 (1)(b)

34) <u>J.W. V. State</u> gives this opinion:
Although it is possible that the officer witnessed other behavior on the part of J.W. that caused concern for his well-being, the affidavit was the sole factual basis for the pleas, and it did not provide an articulable reason for J.W. to have been subjected to an involuntary physical seizure under the Baker Act. See <u>Watkins V. Bigwood, 797 Fed. Appx. 438, 442</u>

p.g. 30 of 126

(11th Cir. 2019) ("For Plaintiff to be detained lawfully under the Baker Act, probable cause must have existed evidenced by Plaintiff's recent behavior—to believe that a 'substantial likelihood' existed that Plaintiff would cause 'serious bodily harm' to himself or to others in the near future. This standard is a high one: for example, a reasonable belief about 'some likelihood,' 'might cause' 'some kind of bodily harm,' 'at some point in the future' is not good enough for probable cause to deprive a person of their freedom." (quoting §394.463(1)(b)(2))).

35.) An objective review of my present complaint will show two different Police officers (Dagostino and Summersdorf; both on the same day, at the same location, but at seperate times) giving no indication of and/or even suspected a mental illness or impairment and/or any notion of the need to declare a medical emergency due to mental illness. In fact, the officers come "on scene", interacted with me and then left me there with the knowledge that I was there for my property and was "not happy" and even advised the dispatch operator that I was not leaving untill I got my property. (reference Event Report by Dagostino, Event ID: 2020-39522)

36.) At 2am, through a report by Dagostino, the LPD knew the reason for me waiting in the Police Parking lot (I wanted my property).

P.g. 31 of 126

37.) At 3:44am officer Summersdorf "clears the call" by clarifying and confirming everything is ok, that I was left in my vehicle, and the doors to the Police department were still locked. This officer reports spending from 2:53am — to— 3:44am (over an hour) with me and he gave no indication or even thought that an emergency medical examination needed to be done immidiately due to a mental illness that without immidiate treatment would put me and/or others in physical danger.

38.) Neither officer makes any such report of even possible mental illness and both of them even leave the scene confident enough that there is no risk to safety, security, or serious bodily harm to anyone.

39.) Yet hours latter, other officers who make no mention that I am there requesting my property be returned to me or that I have been there patiently waiting for hours for the evidence/property department to open; suddenly they declare I am suffering from a medical emergency that needs an immidiate mental examination or else due to my mental illness I will cause serious bodily harm to someone in the near future, but not in the last several hours that I patiently waited in their parking lot for the property department to open.

40.) In fact, by waiting for hours for the property department to open I displayed patient control of my emotions, organized goal oriented thought in getting my property, knowledge

p.g. 32 of 126

Of current time and place, and submissive calm behavior when interacting with officers. All of these are exactly the opposite of all the behaviors officers should look for in declaring a medical emergency; and the reason I told them they could not Baker Act me because I did not meet the Baker Act requirements/criteria.

41) It was the group of officers that came on shift in the morning of 8/17/2020 that formulated the malicious idea to declare a medical emergency and use the Baker Act to remove me from their property and falsely incarcerate me without consequences; and they were right, it has been about 5 years since this incident and I am still struggling to hold them accountable for their malicious actions.

42) In the Law Enforcement Baker Act Form, Paonessa (does not state) only checks the box that claims I am unable to determine for myself whether examination is necessary. I give notice that I was never asked or given any reason to consider a medical emergency for a mental health examination.

43) The Baker Act form by Paonessa states nothing of the "circumstances" supporting his opinion of threats to others and/or violent actions that put others in immidiate danger of serious bodily harm to myself or others.

P.g. 33 of 126

44.) Defendants failed to state (in their Baker Act report) why there was reason to believe I had a mental illness.

45.) Defendants failed to explain to me the urgent need for an immidiate examination, or to even record on the Baker Act forms why I was unable to make the decision for a mental health evaluation for myself.

46) Defendants failed to state in their Baker Act reports what part of my recent behavior lead the officers to believe that I posed an imminent threat to others. Noting that having a broom stick and swinging a ball around on a rope is more of a baseball exercise to pass the hours by myself in an empty parking lot, rather than a mental illness that is an immediate threat to others.

47.) Defendants failed to quote any violent statements or behaviors in their Baker Act reports because I was never violent, nor did I resist their malicious arrest and detention.

48.) Defendants failed to state in their Baker Act reports why they had come in contact with me or why I was at the police station. Note: officer Dagostino does give the honest reason for why I was at the police station earlier that morning in a seperate event ID (2020-39522) that was not included in case #2008-0242.

49) Being in possession of a stick is not a threat to others, nor is it evidence of being at risk of suicide.

Pg. 34 of 126

50.) Though I did not make any obscene statements that day, saying "Fuck you Pigs" is not a threat, nor does it display a mental illness in need of a medical emergency for a mental examination.

51.) Paonessa falsely states that I made "irrational statements." He does not provide or even quote these alleged statements, but simply summarizes this false idea by stating I said something "LIKE": "The government is after him and he knows they are spying on him." Paonessa purposefully fails to give the actual reason for why I was at their police department (to recover my property) and/or what I was waiting for so many hours for (the property/evidence department to open). I did a peaceful "sit in" protest and complained about the actions and ways of operation of the LPD officers. Paonessa uses my dissent against his police department to say I was making "irrational statements" about the government. Nothing about what I said or did was irrational.

52.) In their motion to dismiss defendants give a laundry list of made up witnesses and false statements (after I submitted the truth in a complaint to this court), but on the Baker Act Form, where the officers are to fill out the name fields for any and all witnesses and include any witness statements of the alleged behaviors and statements — there is nothing — not a single witness or witness statement, and the laundry list of alleged actions is no where to be found. Apparently there were

Pg. 35 of 126

either no other people present when I was taken into custody (which we know for a fact is false), or no other people wanted their names associated with a malicious/false Baker Act so that they would not be held responsible and/or accountable (just like they are all claiming now that most of them had nothing to do with the Baker Act). That is why they made the trainee sign the official medical document for the Baker Act without any witnesses to colloberate his statements; and even further they give the false excuse that the reason their report was not more specific is because, "The handwritten Baker Act forms are considered confidential medical information, so officers are trained not to report too much detail on this typed form." (reference motion to dismiss p.g. 22). This is exactly the opposite of what is presented in Document 131-1 (1142-1162).

53) I give notice that NONE of the LPD training documents discuss or even mention the malicious/bad faith use of the Baker Act (Fla. Stat. §394.463(5))

54) The main question here is, did I (by waiting for the Leesburg Police department property section to open so that I could get my property) show signs that a mental illness would put me and others in immediate physical danger unless the officers intervined by declaring (in good faith) a medical emergency that would honestly help me with my alleged mental illness, but not deal with my complaint and return my property to me?

55) The answer is NO, I did not show signs of a mental illness in immidiate need of emergency medical attention; and NO, the officers did not deal with my complaint or return my property to me. Instead they knowingly broke the law by maliciously claiming a medical emergency to remove me from their property.

56.) Defendants <u>do not</u> qualify for immunity because they (as a group) came to an agreement to act in <u>bad faith</u> and with <u>malicious intent</u> in submitting me to the Medical emergency of the Baker Act in violation of Fla. Stat. § 394.463(5).

57.) Just like in <u>J.W. V. State</u>, these officers were also not engaged in the lawful performance of their legal duty. They saw me in their parkinglot; they asked me what I was doing there? I told them I was waiting to get my property. Then they asked me to leave because their property department was not open yet. When I refused to leave without my property they Baker Acted me.

58.) Two reasonable officers earlier that same morning (who were not part of the malicious agreement) did not even hint at the possibility of a medical emergency, and understood that I reasonably wanted to "sit and wait" to get my property back.

## B.) Probable Cause

1) In Section III, pg. 13 of the defendants motion to dismiss, the defendants falsely claim that I have "not made a single factual allegation regarding any of the officers that would show "bad faith" or "malicious purpose.""

2) In Section IV (D)(A)(9-23) of my amended complaint (Doc. 18) I state facts and describe how the officers (without probable cause or excuse, and as a group) without any warning agressively approached me, surrounded me, physically restrained me, searched my car, and even deleted my cell phone video evidence of their actions; all due to my choice to 'sit and wait' at their police station for my property and in peaceful protest of their actions.

3.) From the reports of the two officers earlier that morning and my testimony, the court can discern my reasonable intent and purpose for that day. Even more, from the acts and omissions of the officers in the incoming morning shift the court can discern their malicious purpose and/or a malicious exercise of statutory power.

4.) The officers actions were plain official misconduct due to the lack of probable cause and/or the lack of meeting the statutory requirements to declare the medical emergency under the Baker Act. In fact, the officers were in plain violation of Fla. Stat. § 394.463(5).

5.) The defendants erroneously claim in Section III, p.g. 13 of their motion to dismiss that, "even the allegation that an officer may have acted without arguable probable cause is not enough to pierce the officers immunity." This Statement is False because the minimum requirement to qualify for immunity is arguable probable cause. Arguable probable cause would mean that the officers were acting in good faith.

6.) Yet I am saying that the officers acted with bad faith. I am saying that they knowingly and maliciously declared a medical emergency on me (the Baker Act) because I refused to leave their parking lot without my property.

7.) "In practice, qualified immunity protects all [officers] but the plainly incompetent or those who knowingly violate the law." Ashcroft V. al-Kidd, 563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) (quoting Malley V. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

P.g. 38 of 126

8.) According to Wood V. Kesler, 323 F. 3d 872, 878 (11th Cir. 2003) ("For Probable cause to exist, arrest must be objectively reasonable based on totality of circumstances.") But, in the reports from 8/17/2020 and in the affidavits presented by the defendants in their motion to dismiss, the defendants purposefully omit and/or withhold the full circumstances of the fact that I had been peacefully waiting patiently in the police parking lot for hours without any incident or anyone being in any immediate danger of serious bodily harm due to a fictitious mental illness.

9.) The defendants maliciously withheld and/or omitted that police dispatch had even sent two officers at two separate times (one to respond to my request for assistance [who confirmed what I was there for], and the second to check on me at the empty Police parking lot and make sure everything was ok, safe, and/or without incident; which he confirmed in his report that everything was OK.)

10.) In my case the Baker Act was <u>not</u> objectively reasonable and the reports do not even mention the reason I was there at the police station to begin with; omitting and/or withholding the totality of the circumstances for the Baker Act because it was unreasonable.

11.) The defendants try their best to make it "sound like" I was a lunatic running around the parking lot out of my mind, which is far from the truth; and they try to use hearsay along with past and present animosity to support their group decision to Baker Act me.

P.g. 39 of 126

12.) To get me to leave their Parking lot I required that they (the defendants) simply return my Property to me, which is a reasonable request. Not only did they refuse to return my property, but because I had not broken any laws (in order to initiate a valid arrest for either criminal mischief [the false allegations of destroying their flower beds] or assault on Police officers [the yelling threats and obscenities or the hitting of fences they were standing behind]) they maliciously declared a medical emergency and Baker Acted me.

13.) In Watkins V. Bigwood, 797 Fed. Appx. 438 (2019) ("Arrestee sufficiently alleged that he was involuntarily detained at mental health facility under Florida's Baker Act without probable cause or even arguable probable cause, due to alleged absence of substantial likelihood that arrestee would cause serious bodily harm to himself or to others, as required to state § 1983 claim for false arrest in violation of Fourth Amendment against Law enforcement officers...")

14.) ("Probable cause may not be established simply by showing that the officer who made the challenged arrest or search subjectively believed he had grounds for his action. As emphasized in Beck V. Ohio [379 U.S., 89, 85 S. Ct. 223 (1964)]: 'If subjective good faith alone were the test, the protection of the Fourth Amendment would evaporate and the people would be "secure in their persons, houses, papers, and effects" only

p.g. 40 of 126

in the discretion of the police". The probable cause test, then, is an objective one; for there to be probable cause, the facts must be such as would warrant a belief by a reasonable man.") <u>Wayne R. LaFave and Jerold H. Israel, Criminal Procedure § 3.3 at 140 (2d ed 1992).</u>

15.) ("The necessity of a law enforcement officer's actions of ensuring safety while in a community care taking role does not create an inchoate warrant to bypass every protection of the Fourth Amendment.") <u>S. P. V. State, 331 So. 3d 883 (2022)</u>

16.) ("Even when responding to mental health crises, police officers and sheriff's deputies are still armed officers of the state, and as such, the Fourth Amendment requires them to exercise their search and seizure powers in a reasonable manner.") <u>S.P. V. State, 331 So, 3d 883 (2022)</u>

17.) ("The [Fourth] Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the government, without regard to whether the government actor is investigating crime or performing another function.") <u>City of Ontario, Cal. V. Quon, 560 U.S. 746, 755-56, 130 S. Ct. 2619, 177 L. Ed. 2d 216 (2010)</u>

18.) In my complaint, Police officers were <u>not</u> responding to any calls for a mental health crises. They were just gathering

Pg. 41 of 126

for their begining of shift meeting when they agreed to use the Baker Act (declare a medical emergency) as an avenue to punish me for refusing to leave their property when they wanted me to leave.

19) In the affidavits of the defendants, the officers give a laundry list of false accusations which would have given them probable cause (at the minimum) for a misdeminor arrest; ① destroying flower beds (criminal mischief), ② Verbally threatning Police officers (assault on law enforcement officer, "LEO"), or ③ Physically threatning Police officers by banging the fence they were standing behind, with a stick (assault on "LEO"). These officers did not charge me with this laundry list of accusations because none of these things happened on that day.

20) What did happen on 8/17/2020?

A.) I sat in peaceful protest and waited for hours in the Police parking lot for the police property/evidence department to open in the morning so that I could retrieve personal property that was wrongfully taken by Police officers. (reference exhibit   : report by officer Romanelli where he admitted my property was taken by officers; and exhibit    receipt of some of the items taken by officers)

B.) I did have all of my car doors open on a muggy morning in the middle of August in Central Florida. It is reasonable to think that I would not waste gas sitting in my car with my air conditioning runing for multiple hours and would rather open my car doors.

Pg. 42 of 126

C.) I was listening to music with my car doors open,

D.) Throughout the long hours I spent in the empty police parking lot I did take advantage of available time and plenty of space to practice "Staff Kata" (also known as practicing Martial arts forms with a long stick). By no means does having Knowledge of martial arts mean I was Suffering from a mental health emergency crisis by which without medical intervention I would be an immidiate danger to myself or others.

E.) Having the Knowledge and ability of Martial arts does not automatically qualify me or anyone else as a danger to myself or others.

F.) Peacefully protesting against and/or expressing my dissent with the Police department and its officers does not make me a psychotic individual suffering from delusions of the "government watching/spying on me." What it means is that I disagree with the way the police department is doing things/operating.

G.) Disagreeing with the actions of Police officers does not mean that I am suffering from a mental health crisis for which without immidiate medical intervention, I would be a danger to myself or someone else in the near future.

p.g. 43 of 126

H.) The false accusations of these defendants is an exageration of a bad faith cheap attempt at maliciously meeting the requirements for a medical emergency (Baker Act) against a person (me) who the officers hold a strong animosity towards. These are their subjective opinions.

# C.) Police Officer Duty of Care

1.) Florida Courts have determined that "a special duty is established when a police officer makes a direct representation to a plaintiff, or one so closely involved with the plaintiff that their interests cannot be separated, that he or she will take a specified law enforcement action." Pollock V. Florida Dept. of Highway Patrol, 882 So, 2d 928 (2004)

2.) "A police officer's decision to assume control over a particular situation or individual or group of individuals is accompanied by a corresponding duty to exercise reasonable care." Pollock V. Florida Dept. of Highway Patrol

3.) In Section IV, pg. 21 of the defendants motion to dismiss, the defendants state: "There are no facts alleged to support any special duty owed to the plaintiff by the City.... There is simply no properly asserted basis for liability of the City or the officers and the amended complaint (Doc. 18) should be dismissed with prejudice."

p.g. 44 of 126

4) <u>Willingham v. City of Orlando, 929 So. 2d 43, 48</u>
<u>(Fla. 5th DCA 2006)</u> States: ("There can be no governmental
liability in tort **UNLESS** a common law or statutory
duty of care existed that would have been applicable
to an individual, as opposed to the general public, under
similar circumstances.")

5) <u>Willingham v. City of Orlando</u> also states: ("**IF** no
duty of care is owed to an individual with respect to
alleged tortious conduct, there is no governmental
liability and the question of whether the sovereign
is immune from suit need not be reached.")

6) But, the officers in my amended complaint (Doc. 18) **did**
owe me a duty of care both when they physically
restrained and searched me (special duty of care due to
custody); and when they chose to use the Baker Act
(statutory duty of care pursuant to FSS § 394.463(1))

7) ("Custody is but one means through which the police may
create a special duty of care with regard to an individual.")
<u>Wallace v. Dean, Supreme Court of Florida, 3 So. 3d</u>
<u>1035 (2009)</u>

8) According to <u>Wallace v. Dean</u>: ("There are generally four
recognized bases for imposing a duty of care: ① legislative
enactments or administration regulations; ② Judicial
interpretations of such enactments or regulations; ③ other
judicial precedent; and ④ a duty arising from the general
facts of the case.")

9) Florida Statute § 394.463(1) specifically states the criteria for an involuntary examination with regards to people with mental illness. This statute applies to Circuit and County Courts, to law enforcement officers, and to physicians and/or their assistants.

10) FSS § 394.463(5) states it is unlawful for a person to knowingly and willfully furnish false information for the purpose of obtaining emergency or other involuntary admission of another or cause or other wise secure, or conspire with or assist another to cause or secure any emergency or other involuntary procedure of another person under false pretenses. This statute even goes as far as stating the punishments by the State of Florida for those that violate this subsection.

11) ("A duty of care requires that the defendant "conform to a certain standard of conduct... for the protection of others against unreasonable risk.") Clay Elec. Coop., Inc. v. Johnson, 873 So. 2d 1182, 1185 (Fla 2003).

12) Officers in my amended complaint did not conform to the standard of conduct outlined in the Fourth Amendment or in FSS § 394.463(1)

13) Wallace V. Dean also states: ("Where questions of duty arise in connection with potential governmental liability, we have provided a "rough" general guide concerning the type of activities that either support or fail to support the recognition of a duty of care between a governmental actor and an alleged tort victim.

See _Trianon Park Condominium Association V. City of Hialeah_, 468 So. 2d 919 (Fla. 1985) ("Providing the following list of governmental activities: ① legislative, permitting, licensing, and executive officer functions; ② enforcement of laws and the protection of the public safety; ③ capital improvements and property control operations; and ④ providing professional, educational and general services for the health and welfare of... citizens.")

This list is known as the Trianon Taxonomy

14) _Wallace V. Dean_ also states: ("Activities falling within category two are generally owed to the public at large; however, the plaintiff must be given an opportunity to plead facts alleging that the governmental actor owed the alleged tort victim a "special duty of care.")

15) ("We recognize that, if a special relationship exists between an individual and a governmental entity, there could be a duty of care owed to the individual.") _Everton V. Willard_, 468 So. 2d 938 (Fla. 1985)

16) The following is a disjunctive list of exceptions to the Trianon Public-duty doctrine: "A special tort duty... arise[s] when law enforcement officers become directly involved in circumstances which place people within a "zone of risk" ① by creating or permitting dangers to exist, ② by taking persons into police custody, ③ detaining them, or ④ otherwise subjecting them to danger." _Pollock V. Fla. Dept of Highway Patrol_, 882 So. 2d 935 (Fla. 2004)

17.) According to Trianon Park Condominium Ass'n, Inc.
V. City of Hialeah, 468 So. 2d 912 (1985) (Ehrlich, dissenting)
"It is well settled at common law that a statute creates a
duty running from one whose behavior is the subject of
the statute to an individual if that individual is in the
class designed to be protected by the statute and the
injury suffered is the harm the statute is intended to
prevent. All private citizens are liable for breaches of
statutorily imposed duties. A governmental agency, through
its employees, then should be liable for breaches of
statutorily imposed duties under precisely the same analysis."

18.) The "principle that written agency protocols, procedures, and
manuals do not create an indipendent duty of care,
applies **unless** the Sovereign adopts such protocols
and procedures as standards of conduct, in which
case there would exist an independent duty of care."
Pollock V. Florida Dept. of Highway Patrol, 882 So. 2d
928 (2004)

19.) FSS § 394.463 was created for the protection of
individuals and/or the class of people who suffer from
mental health issues. This statute creates a
one-to-one duty of care.

p.g. 48 of 126

# D.) Discretionary VS. Operational Acts

1.) In Section III, pg. 8 of the defendants motion to dismiss, defendants quote Harlow V. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) as saying:

The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages in sofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

2.) As I have stated in my amended complaint (Doc. 18) and in the previous sections of this responce; the officers **did knowingly** violate clearly established statutory and constitutional rights of which a reasonable officer (like the two officers earlier that same morning) would have known. Therefore the defendants are <u>not</u> individually sheilded from liability for civil damages due to performing operational functions.

3.) The actions of these defendants did not require the exercise of basic governmental discretion, therefore they are not discretionary actions. These officers only implemented an already established policy (Fla. Stat. § 394.463), therefore their actions are operational not discretionary.

4.) No reasonable basis exists for arguing that a police officer is making a policy or planning judgment. Rather, the policy and planning decision has already been made by the legislature.

P.g. 49 of 126

5) In short, an act is "discretionary" if it involves an "exercise of executive or legislative power such that, for the court to intervene by way of tort law would inappropriately entangle it in fundamental questions of policy and planning." Department of Health and Rehabilitative Serv. V. Yamuni, 529 So. 2d 258, 260 (Fla. 1988)

6) Conversely, an "operational" act is one not necessary to or inherent in policy or planning, that merely reflects a secondary decision as to how those policies or plans will be implemented. Kaisner, 543 So. 2d at 737
Kaisner V. Kolb, 543 So. 2d at 737, Florida Supreme Court, March 30, 1989

7) Under Florida law, when an officer has made an initial discretionary decision to conduct a stop and then proceeds to carry out that decision, the officer is no longer exercising a "discretionary" function, but is engaged in an "operational" task. Kaisner, 543 So. 2d at 734, 737-38

8) In my cause the officers had an obligation to not retaliate against my first amendment peaceful protest expression to 'sit and wait'; they had an obligation to meet the probable cause requirements of the fourth Amendment before physically restraining me and searching me and my property; officers also had the statutory obligation to proceed with reasonable care in meeting the requirements of FSS § 394.463(1).

9) As a direct result of the officers malicious conduct, I was deprived of my liberty without just cause and deprived of my right to protest and/or express my free speech against my government.

P.g. 50 of 126

10.) In my amended complaint, the actions of the officers did not require basic policy evaluation or expertise, rather, they required an assessment of how to implement policy; I merely ask the courts to consider the way in which the Baker Act (medical emergency) was implemented, not the fundamental wisdom of creating the Baker Act law.

11.) ("No right granted or secured by the Constitution of the United States can be impaired or destroyed by a state enactment, whatever may be the source from which the power to pass such enactment may have been derived. The nullity of any act inconsistent with the Constitution is produced by the declaration that the Constitution is the supreme law.") Dobbins v. City of Los Angeles, 195 U.S. 223 (1904)

12.) Therefore, due to the Supremacy of the Fourth Amendment of the U.S. Constitution, the argument presented by the defendants in Section IV, p.g. 24 of their Motion to dismiss; "4th Amendment does not apply to Plaintiff's Baker Act confinement," is False. The medical emergency (Baker Act) was Not Lawful, therefore the imprisonment and arrest were not under valid legal authority, but the defendants acted "under color of state law," therefore it is by definition a false arrest.

13.) The city does not have the right to "deprive the citizens of rights protected by the Constitution, under the guise of exercising the Police powers reserved to the States.

P.g. 51 of 126

14) The City of Leesburg Police officers misused or improperly exercised their statutorily or otherwise duly conferred authority in a way that was tortious unlawful, or outside its proper scope (abuse of power).

15) Black's Law Dictionary, 11th edition defines a discretionary act as an act or duty involving an exercise of judgment and choice, not an implementation of a hard-and-fast rule exercisable at one's own will or judgment.

16) ("one who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed is subject to liability to the other for harm caused by the abuse of process.") Restatement (second) of Torts § 682 (1977).

17) Black's Law Dictionary, 11th edition defines the "abuse of rights doctrine" as the principle that a person may be liable for harm caused by doing something the person has a right to do, if the right is exercised; ① for the purpose or primary motive of causing harm, ② without a serious and legitimate interest that is deserving of judicial protection, ③ against morality, good faith, or elementary fairness, or ④ for a purpose other than its intended legal purpose.

18) Wallace V. Dean, 3 So. 3d 1035 (2009) states the following regarding discretionary function; ("we further conclude that the sheriff's deputies were performing an operational level function, which involved the implementation of a pre-existing policy or program, and that this operational conduct did not involve the exercise of any type of quasi-legislative discretion.")

pg. 52 of 126

19.) The Florida legislation did not intend to permit police officers to use their personal judgment and conscience (also termed discretion) when submitting a person to an emergency involuntary examination. That is why the criteria in FSS §394.463(1) was created, along with a section just for law enforcement under §394.463(2)(a)(2).

20.) The Florida legislators were even able to foresee the malicious and/or bad faith abuse of the Baker Act and therefore incorporated a section (Fss §394.463(5)) to specifically address and deter the bad faith abuse of declaring a medical emergency and forcing a person into an involuntary examination. This is the same section of the Baker Act statute that (even though the Florida legislators can foresee as being vital to prevent and/or deter false Baker Acts) the City of Leesburg and its police administrators failed and/or were deliberately indifferent to train and/or advise their police officers on. (reference "Law Enforcement and the Baker Act", Document 131-1, 1144-1162).

21.) My personal experience is that the City and its police officers use this lack of training on this section of the Baker Act (Fss. §394.463(5)) as plausible denyability because they have been using the Baker Act to remove the homeless people from the City streets. Using the Baker Act against the homeless was one of the criticisms/desents I was openly voicing against the City of Leesburg and its police officers.

P.g. 53 of 126

22) ("the decision as to how to implement or operate a policy is secondary to the decision to create the policy... methods of implementation of policy are at best a secondary concern. Plaintiff, in this case is asking the court to consider the way in which this policy was implemented and not its fundamental wisdom.") Wilson V. Miami-Dade County, 370 F. Supp. 2d 1250, 1255 (S.D. Fla. 2005)

23) In my cause the application of traditional principles of tort law will not entangle the judiciary in fundamental questions of public policy or planning. It merely will require the courts to determine if the officers should have acted in a manner more consistent with my First, Fourth, and Fourteenth Amendment constitutional rights; and my rights under FSS § 394.463(1)

24) Functionally, the discretionary-versus-operational function test is intended "to determine where, in the area of governmental processes, orthodox tort liability stops and the act of governing begins." Commercial Carrier V. Indian River County, 371 So. 2d 1010 (Fla 1979)

25) ("Probably no one test will control the decision on discretionary immunity. Although the fact that the government has omitted to act is not itself a defense, the discretionary immunity is frequently emphasized in nonfeasance cases. On the other hand (where the government activity is affirmative, specific, and in violation of a statute, regulation, or constitutional provision imposing a duty upon government) courts are often willing to say there is no room for discretion.") W. Page Keeton et al., Prosser and Keeton on the Laws of Torts § 131, at 1041-42 (5th ed. 1984)

26) Yamuni, 529 So. 2d at 260 states the following:

("[we have rejected] the definitional approach to "discretion"... because all governmental functions, no matter how seemingly ministerial, can be characterized as embracing the exercise of some discretion in the manner of their performance. [Commercial Carrier,] 371 So. 2d at 1021 we have no doubt that the [governmental agents] exercised discretion in the dictionary, or *English* sense of the word, but discretion in the Commercial Carrier sense refers to discretion at the policy making or planning level." "Planning level functions are generally interpreted to be those requiring basic policy decisions, while operational level functions are those that implement policy." Commercial Carrier, 371 So. 2d at 1021

27) My cause is not a political question, it is a legal question. ("[P]olitical questions as opposed to legal questions fall within the exclusive domain of the legislative and executive branches under the guidelines established by the Florida Constitution. Art. II, § 3, Fla. Const.")

28) Black's Law Dictionary 1197 (8th ed. 2004) states:
("Political question. A question that a court will not consider because it involves the exercise of discretionary power by the executive or legislative branch of government.")

29) Upon further review and under consideration the court will find that the actions of the officers were clearly operational in nature.

P.g. 55 of 126

30) Subjecting the City of Leesburg to responsibility and accountability in my cause does not involve judicial scrutiny of any discretionary, quasi-legislative policy making or planning; instead, such a legal inquiry will merely require the trier of fact to determine (consistent with traditional principles of Florida tort law) whether the officers should have acted in a manner more consistent with my rights under the First, Fourth, and Fourteenth Amendments; and under FSS § 394.463 (1)
See Kaisner, 543 So. 2d at 737-38

31) Keeping in mind that the root of issue in _Everton V. Willard_ is discussing a failure to act, I will point to several notes from Justice Shaw (dissenting).

32) _Everton V. Willard, 468 So. 2d 936 (1985) (Shaw, Justice dissenting)_ states the following: ("we could have strengthened our conclusion that the legislature did not intend a discretionary exception to the waiver by noting that section 768.15, Florida Statutes (1969), enacted by chapter 69-116 which waived sovereign immunity but contained a discretionary exception was repealed in the same legislative session by chapter 69-357, Section 1, Laws of Florida. The discretionary exception was not included when the legislature reenacted the waiver of sovereign immunity, Section 768.28, in 1973. This change in the law reflects a conscious decision on the part of the legislature to broadly waive sovereign immunity without a discretionary exception.")

33) _Everton V. Willard (Shaw, Justice dissenting)_ states the following: ("the Federal waiver of sovereign immunity contains an explicit exemption from suit for discretionary

Pg 56 of 126

functions. Thus, Federal law should logically be more receptive than Florida law to the argument that discretionary decisions of police officers are exempted from suit. It is noteworthy that the Court in Downs v. United States, 522 F. 2d 990 (6th Cir. 1975), rejected this proposition under circumstances where an FBI agent in charge was faced with extremely difficult decisions as to how to cope with an aircraft hijacking. The Court held that the agents activities did not entail the formulation of governmental policy and did not fall within the discretionary function exception. Thus, in the Court's view, it was proper to scrutinize the day-to-day activities of law enforcement officers for purposes of determining governmental tort liability.")

34.) In the State of Florida there is no mandate to exempt discretionary functions or operational acts.

35.) In Everton v. Willard (Shaw, Justice dissenting); respondent urged "various reasons why immunity is necessary when a police officer is faced with a decision as to whether or not to arrest a particular individual. Broadly, these reasons are based on the Doctrine of the separation of powers. It is urged that judges and juries, in the later tranquility of the courtroom, cannot be permitted to "second guess" the decisions of police officers made under the stress and strain of the "street world" with its conflicting demands and dangers. I appreciate the difficulties faced by police officers, but the very demands and dangers faced by these officers and the speed with which they must act is itself an argument for examining these actions in the later tranquility of a court. The purpose of the examination is to do justice

to the purported tort victim and to bring problems
to the attention of the government and public,... This is
constitutionally permissible so long as the alternative
remedy of suing the government is available. Further,
judges and juries routinely examine or "second guess"
the actions of police officers in order to protect the
constitutional rights of accused persons without any
suggestion or fear that this violates the separation of
powers doctrine. I can see no reason why courts should
not hear justiciable tort suits in order to protect the
constitutional right of tort victims to access to the
courts for redress of wrongs by governmental entities
and their employees. Indeed, in my view, we have the
constitutional duty to do so."

36) In <u>Everton V. Willard (Shaw, Justice dissenting)</u>, respondent
urged "that denying immunity for the discretionary acts of
police officers will "chill" the officers in the performance
of their duties. I do not believe there will be any unwholesome
chilling of police officer conduct. My view is consistent with
the Downs Court's rejection of the "chilling effect" argument."

    ("The prospect of governmental liability for the actions of
law enforcement officers should not cause those officers
less vigorously to enforce the law. The need for compensation
to citizens injured by the torts of government employees
outweighs whatever slight effect vicarious government
liability might have on law enforcement efforts.")
<u>Downs V. United States, 522 F. 2d 998 (6th Cir. 1975)</u>

37) <u>Everton V. Willard (Shaw, Justice dissenting)</u> further states
the following: ("The choice is whether the tort victim should
bear the full cost of the injuries or whether society at

large, through its government, should bear the cost of torts committed in the scope of governmental activities. The choice has already been made by the legislature in accordance with article X, Section 13, Florida Constitution, and we have no authority to overrule that decision.

("Any doubt about the legislative intent in enacting the waiver of sovereign immunity can be resolved by listening to the tapes of the hearings before the House Judiciary Committee in 1973. These hearings culminated on April 12, 1973. At this hearing lobbyists representing county commissions and school boards appeared and urged that the waiver not be enacted because of the potential liability it would create and the difficulties it would pose for governmental entities. Representatives Tucker and Martinez, the sponsors of House Bill 315 waiving sovereign immunity, replied in unmistakable terms that: ① governmental entities were not Kings who could do no wrong; ② the purpose of the bill was to compensate victims of governmental torts just as victims of private tortfeasors were compensated; ③ governmental entities should have insurance to compensate victims; ④ the cost of insurance and of compensating victims was a legitimate cost of government which the people should support; and ⑤ it was inconceivable, in the sponsors' view, that anyone in contemporary times could oppose the right of a tort victim to seek redress in a court of law. The Committee then voted 14-0 to report the bill.") See Tape I, Hearings before House Judiciary Committee, 4-12-73, Series 414, Florida State Archives.

pg. 59 of 126

# E.) Separation of Powers Doctrine

1.) Everton V. Willard (Shaw, Justice dissenting) states the following: ("In Florida there is no basis for immunity unless that [separation of powers] doctrine is violated... Our only defensible ground in Florida for creating a discretional exception to the waiver of sovereign immunity is the constitutional doctrine of separation of powers.")

2.) Everton V. Willard (Shaw, Justice dissenting) states: ("In view of article I, Section 21; article X, Section 13; and section 768.28, there is a strong presumption that courts have jurisdiction to hear tort suits against governmental entities.")

3.) Where that constitutional doctrine [separation of powers] is not violated, we have no authority to override the constitutional and statutory provisions authorizing access to the courts for bringing tort suits against the state. To paraphrase Justice Frankfurter in Indian Towing Co. V. United States, 350 U.S. 61, 67, 76 S.Ct. 122, 125, 100 L.Ed. 48 (1955), we are not the self-constituted guardians of the public purse empowered to import sovereign immunity into a statute designed to waive it. The legislature is the primary guardian of the public purse and we have no authority to override its determination that the government will be liable for its torts.

4.) Everton V. Willard (Shaw, Justice dissenting) further states: ("The adequacy of the complaint should be tested by application of the standard tort definitions used in suits against private persons: duty, duty violated, and injury as proximate result.")

5.) Everton V. Willard (Shaw, Justice dissenting), states the following regarding duty: ("There must be an allegation of a special relationship or duty between the government entity and either

the alleged tortfeasor or victim. A general duty, without more, does not establish a special relationship or duty. Conversely, the presence of a general duty does not preclude a showing of a special relationship or duty"
Modlin V. City of Miami Beach, 201 So. 2d 70 (Fla. 1967)

6) Everton V. Willard (Shaw, Justice dissenting) states:
(" There must be a showing, or allegation as here, under traditional tort law that the government entity owed a duty to the plaintiff and that duty was violated.")

7.) Everton V. Willard (Shaw, Justice dissenting) further states:
( "As with private parties in like circumstances, the plaintiff must still show that the defendant owed a duty to him, that the duty was violated, and that injury occurred as a result. The notion that sovereign immunity is the only device to prevent massive raids on the public purse by undeserving plaintiffs is based on the unspoken premise that traditional tort law is inadequate to protect governmental defendants from undeserving plaintiffs. Aside from the question of its truth, this premise must be rejected because it is contrary to the legislative determination that governmental entities will be treated as private persons would in like circumstances.")

8.) Everton V. Willard (Shaw, Justice dissenting) states the following regarding financial burden: (" the legislature has done its work well in devising a coherent systematic plan for dealing with these financial burdens while still providing for adequate compensation for government tort victims.

9.) Everton V. Willard (Shaw, Justice dissenting) states the following regarding liability: ("The plaintiff bears the burden of proving actionable negligence under the general tort law of the state but the tortfeasor, not the tort victim, will bear the burden of liability if tortious conduct is proven.")

p.g. 61 of 126

10) Everton V. Willard (Shaw, Justice dissenting) further states the following regarding representative Tucker's words on the legislative waiver of sovereign immunity: ("We are trying to protect everybody... we are trying to provide for rights. If you are a conservative person, then you believe in conserving human life, you believe in protecting people against the willful or negligent acts of others and we have a responsibility to the people of this state.")

11.) In Ingraham V. Dade County School Board, 450 So. 2d 847 (Fla. 1984) The conclusion is inescapable: ("when the state or a political subdivision has purchased liability insurance which covers the tort injury sued on, neither the government unit nor the insurance company may plead sovereign immunity. To do so would utterly frustrate legislative intent and render the payment of insurance premiums a useless act.")

12) Everton V. Willard (Shaw, Justice dissenting) states the following: ("Even if it is assumed, arguendo, that the separation of powers doctrine somehow bars entertaining such suits in a court of law, article II, section 3 establishing the separation of powers by its terms contains an exception—"unless expressly provided herein"— which is met by the article X, section 13 provision for 'suit against the state'. A suit can only be heard in the judicial branch.")

13) Further, a judgment by the judicial branch on these enactments and/or laws that create duty does not represent an unconstitutional intrusion by the judiciary into the discretionary judgmental functions of both the legislative and executive branches of government, therefore, no violation of separation of powers.

pg. 62 of 126

14) With government liability in mind, the legislature intended the government to operate as a corporation, whom due to the risk of liability, must purchase insurance to compensate victims of governmental torts.

15) In Section IV, p.g. 20 of the defendants motion to dismiss, the defendants state: (" To hold a city liable for the negligent decisions of its public safety officers would require a judge or jury to second the officers in making these decisions and would place the judicial branch in a supervisory role over basic executive branch, public protection fuctions in violation of the separation of power doctrine." This statement is False.

16) Our entire American democracy is built on the idea of a separation of powers that envokes the familiar system of checks and balances between the judicial, executive, and legislative branches of government, each with its independent constitutional basis.

17) Trianon Park Condominium Ass'n, Inc. V. City of Hialeah, (Shaw, Justice dissenting) states the following: ("If a government entity is sovereignly immune from suit because of the separation of powers doctrine, there is no jurisdiction over the person (party) and the courts may not hear or address the merits of the case. Thus, any discussion of duty can only mean one of two things: the city is not sovereignly immune from suit and the courts have jurisdiction to decide the case on the merits using traditional tort principles; or, the city is immune and the court's analysis of the merits is dicta.")

18) In Section III, pg. 18 of the defendants motion to dismiss, the defendants state that use of force, decision to make arrest, and disciplinary actions of employees are all discretionary/planning functions that are protected by sovereign immunity. This Statement is false, they are operational actions.

19) If the statement above (in #18) was correct then there would be no reason for the Fourth Amendment of the U.S. Constitution or § 1983 for complaints against those acting under color of law.

## IV) Legal Duty by the City

The City does have a legal duty to adequately train the city Police officers and city employees.

1.) In Section III, pg. 17 of the motion to dismiss, the defendants incorrectly state that ("In all counts, Plaintiff, again in conclusory fashion, alleges that the Laundry list of officers should not have "Baker Acted" him"). This Statement is False.

2.) In my amended complaint (Doc. 18) under section IV (D)(E)(I) I clearly state: "The City of Leesburg and it's policy makers (unknown officer #5 [chief of police], Iozzi, and Romanelli) failed and/or were deliberately indifferent in their duty to train and supervise the defendant officers on the proper use of the "Baker Act" law, violations of Federal Constitutional or Statutory rights, and the consequences of violating said rights."

3) In Section III, pg. 18 of the motion to dismiss, the defendants state: "Plaintiff attempts to allege liability of the police chief and other administrative officers for classic discretionary matters for which the government and its officers have immunity, such as decisions like, Baker Act criteria and Policies."

pg 64 of 126

4.) Let the Court be aware that the City of Leesburg Police Chief and other City of Leesburg administrative officers were **not** involved in the legislative decisions and/or processes of creating FSS § 394.463 - Involuntary Examination (also known as the "Baker Act"), its' criteria in Section 1, or its policies in Sections 2-5 (as the defendants have claimed in Section III, pg. 18 of the motion to dismiss).

5.) In Section IV, pg. 18 of the defendants motion to dismiss the defendants state that the "city did not owe plaintiff **any** duty of care." This Statement is False.

6.) On pg. 21 of the motion to dismiss the defendants further state: "There are no facts alleged to support any special duty owed to the plaintiff by the city." This statement is also False.

7.) The City of Leesburg, through its police department officials and administrative officers does have the duty to train their officers to follow the statutes enacted by the Florida legislation and at the very least to train their officers to not violate Federal constitutional rights of citizens that they will encounter in the community every day.

8.) As I point out in my amended complaint (Doc. 18) Section IV (D)(E), the failure of the city to properly train its police officers on the Baker Act and on the constitutional and statutory rights of citizens, directly led to a culture, custom, and practice by the police officers of deliberate indifference towards my Federal constitutional and statutory rights when they (as a group that included high ranking police administrators) came in contact with me on 8/17/2020.

Pg 65 of 126

9.) The training on the Baker Act is an operational act by the Police department in following the policies and rules already established and decided on by the Florida legislature. The Florida legislators have the immunity for the discretionary action of creating the Baker Act statute and policies. The Leesburg Police department and its officers are not immune for the operation and execution of the Baker Act, since it is an operational action.

10.) The City of Leesburg has an operational duty to train its officers to follow the laws and policies established by the Florida legislature. This duty comes with the responsibility of having the Police power due to the foreseeability of the application of these laws and policies on the individual citizens of the community (like myself).

11.) The special duty owed by the city is found in the rights of all citizens before and after being placed in Police custody, which was created by the U.S. Constitutional Amendments.

12.) In this present action/complaint, the City and its Police administrators failed and/or were deliberately indifferent in keeping their agents informed of the consequences for violating said rights. Specifically they failed and/or were deliberately indifferent in educating their officers on the foreseeable misuse of the Baker Act and the consequences thereof.

13.) In the present action it is reasonable to assume that the city and its Police administrators knew their officers would encounter people they do not like or agree with in confrontational circumstances that would place its officers with the unique ability to chose to misuse the Baker Act to teach someone a lesson; one that would medically detain an individual that the officers assume is too uneducated and/or lacks the resources to seek legal ramifications for their malicious conduct in the misuse of the Baker Act. This foreseeability (which was seen by the Florida legislators) creates a duty for the city to inform, train, and educate its officers of the consequences for misusing the Baker Act.

14) As I have pointed out in Section D (III) (C) of this response; the actions of the group of officers created a special duty owed to me by the city when they physically restrained me and further when they maliciously agreed (as a unit) to use the Baker Act against my choice to "sit and wait" in peaceful protest at their police station.

15) ("A classic English definition [of duty] from the Late nineteenth Century holds that, when circumstances place one individual in such a position with regard to another that thinking persons of ordinary sense would recognize the danger of injury to the other if ordinary skill and care were not used, a duty arises to use ordinary skill and care to avoid the injury. A much quoted American judicial definition of duty emphasizes its relational aspects, with a focus on the foreseeability of risk to those 'within the range of apprehension.' At about the same time, one of the most creative of American law teachers defined duty as a complex of factors, including administrative, economic, and moral ones, to be applied by judges in their analyses of the legal strength of personal injury cases.") Marshall S. Shapo, The Duty to Act xi-xii (1977).

16) Keeping the statement above (in #15) in mind, a reasonable city would know that its police officers would (on a daily basis) encounter circumstances where they need to use skill and care to follow the constitutional and statutory rights afforded to citizens in the community. The failure of the city to adequately train its police officers on these rights and the consequences for violating them put me and other citizens in the community within the range of apprehension of the foreseeable risk of having our rights violated by the police officers.

17) According to Connick V. Thompson, 563 U.S. 51, 131, S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) ("In limited circumstances, a local government's decision not to train certain employees... to avoid violating citizens' rights may rise to the level of an official government policy for purpose of § 1983.")

18) ("Local governments may be sued for constitutional deprivations visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision-making channels. 42 U.S.C.A. §1983" Monell V. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

19) ("In context of §1983 municipal liability claim, whether a municipality's failure to respond involved a string of unrelated incidents involving different people, or a string of related incidents involving the same individuals, the logical inference available from such a course of "deliberate indifference" is the same, that is, that the municipality encouraged, or at least condoned, a course of unconstitutional activity by failing to take action to deter or eliminate it. 42 U.S.C.A. § 1983") Lozman V. City of Riviera Beach, U.S. District Court, S.D. Florida, August 19, 2014, 39 F. Supp 3d 1392.

20) ("Inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact; only where municipality's

pg. 68 of 126

failure to train its employees in relevant respect evidences "deliberate indifference" to rights of its inhabitants can such shortcoming be properly thought of as city "Policy or Custom" that is actionable under § 1983.") City of Canton, Ohio V. Harris, Supreme Court of the United States, February 28, 1989, 489 U.S. 378, 109 S.Ct. 1197, 103 L. Ed. 2d 412 57 USLW 4270

21) ("It is when execution of a government's Policy or Custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983. 42 U.S.C.A. § 1983") Lozman V. City of Riviera Beach, U.S. District Court, S.D. Florida, August 19, 2014, 39 F. Supp 3d 1392

22) ("In context of municipal liability claim under § 1983, a municipal policy may be expressly chosen by a municipal body, for example, by statute, regulation, rule or ordinance, the existence of an official policy may be inferred from municipality inaction or "deliberate indifference" in the face of a wide spread custom or usage of constitutional deprivations perpetuated by municipal employees or agents, or a person vested with final decision making authority on behalf of the municipality can take action which is said to constitute municipal policy. 42 U.S.C.A. § 1983.") Lozman V. City of Riviera Beach, U.S. District Court, S.D. Florida, August 19, 2014, 39 F. Supp 3d 1392

23) ("In a narrow range of circumstances, a § 1983 failure to train claim against a municipality can succeed without showing a pattern of previous constitutional violations; specifically, liability without a pattern is appropriate where a violation of a Federal right is a highly predictable consequence of a failure to train municipal employees with specific tools to handle recurring situations.") Office of Public Guardian V. Elliot Hospital, United States District Court, D. New Hampshire, September 8, 2022, — F. Supp. 3d 2022 WL 4104502

24) ("Municipality can be held liable under § 1983 if an unlawful custom or practice is so well settled and widespread that the policy making officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.") Baez V. Town of Brookline, Massachusetts, United States Court of Appeals, First Circuit, August 11, 2022, 44 F. 4th 79

25) The City Police administrators chose to and/or passively accepted a culture and custom of deliberate indifference to training Police officers against Constitutional and Statutory violations.

26) My Baker Act on 8/17/2020 was such an obvious display of the officers indifference for my constitutional and statutory rights that the City Police department can be said to have been deliberately indifferent to the need for training officers to not violate the constitutional rights of citizens; and for officers to know the consequences of violating said rights.

27.) Which leads to the major question:
What are the consequences Police officers face for purposefully violating the Constitutional rights of people in the Community?
What are the consequences for Police officers using the Baker Act in bad faith?

P.g. 70 of 126

28) ("While Courts frequently say that establishing 'duty' is the first prerequisite in an individual tort case, courts commonly go on to say that there is a 'general duty' to 'exercise reasonable care', to avoid subjecting others to 'an unreasonable risk of harm' or to comply with the 'legal standard of reasonable conduct.' Though cast in the language of duty, these formulations merely give the expression to the point that negligence is the standard of liability.") Restatement (Third) of Torts § 6 CMt. a (Discussion Draft 1999).

29) In section IV, p.g. 19 of the defendants Motion to dismiss, the defendants state: ("Under Florida law, there has never been a common law duty of care to individuals to provide Public safety services or enforce the law.")

30) The statement of the defendants above in number 29 is refering to a common law duty of care and alleged injury due to a failure to provide Plublic safety services or a failure to enforce the law, both being failures to Act on behalf of the city and its police officers.

31) My amended complaint (Doc. 18) is against actions taken by the city and its police officers, not a failure to Act.

32) It is without question that the City has already acted in providing some type of training to its police officers. This is evident in employing them as Police officers.

33) My amended complaint states that the training already provided by the city to the officers is not adequately training them on the constitutional and statutory rights of citizens or the consequences for violating said rights. This includes misuse of the Baker Act.

P.g. 71 of 126

34) In Section IV, p.g. 20 of the defendants motion to dismiss, the defendants state that "even if a duty of care is owed, a municipality's decisions as to techniques used to provide public safety services are discretionary, planning level decisions for which sovereign immunity applies."
This statement is irrelevant to my amended complaint (Doc. 18)

35) For the statement above (in #34) the defendants paraphrase City of Daytona Beach V. Palmer, 469 So. 2d 121, 122 (Fla, 1985) as stating: ("the decisions of how to properly provide public safety services are discretionary judgmental decisions which are inherent in this public safety function.")

36) Let the Court note that HOW the city is providing its public safety services is not in discussion here, as the defendants attempt to allege in numbers 29 and 30 above.

37) For Example: the city may choose to respond to request for assistance with people suffering from mental illness in a number of ways; they may dispatch city police, county sheriffs, paramedics, firefighters, mental health advocates, or even contract with a private company to respond to these public safety requests for services; yet they all must be trained on the use of §394.463

38) The planning and policy level decision as to HOW to provide public safety services is not in dispute here. The city does have the planning level discretion as to how to provide public safety services, yet those services must still adhere to the statute and policies of the legislature

39) What is in dispute is the lack of adequate training (by the city) that has created and/or permitted a culture, custom, and practice of the city's police officers to be deliberately indifferent to my constitutional and statutory rights; Including my rights in Fla Stat. §394.463

p.g. 72 of 126

40.) With the action of placing me in their custody, these defendants chose to apply and operate under the stipulations of the Baker Act, therefore it was their duty to follow those stipulations and adhere to its policies and requirements.

41) As proven by the training slides provided by the defendants (Document 131-1, 1144-1160), in no way does the city address, instruct, or inform its officers on the rights of citizens and/or the consequences of maliciously using the Baker Act to incarcerate an individual; whether it be the officers direct misuse of the medical emergency policy (as in this present case) or the indirect misuse by a friend, family member, or witness giving a report to law enforcement. The city has been deliberately indifferent to the misuse of the Baker Act in the daily operations of its police officers due to the obvious foreseeable risk of false Baker Acts; a risk that even the Florida legislators could foresee and therefore addressed it in a seperate section of the Baker Act. (reference Fla. Stat. § 394.463(5))

42.) The Baker Act and its stipulations were not created by the City of Leesburg. Neither the city nor its police officers have the discretion to edit or adjust the statute or qualifications of the Baker Act. The city may only operate under the stipulations of the Baker Act, which were established by the discretion and planning level decisions of the Florida legislators. The Florida legislators have immunity, not the City of Leesburg. The City only implemented into its operations the discretionary decisions already made by the legislators.

pg. 73 of 126

43.) The matter at topic here is <u>not</u> the decisions of how to properly provide public safety services in general to the community. The matter at topic is the operational actions of the officers who specifically chose to place me in their custody and maliciously use the Baker Act; in addition to the deliberate indifference of the city in instructing those officers on Fla. Stat. § 394.463(5) — the unlawful activities relating to examination and treatment; Penalties —

44.) The City of Leesburg chose its form of operation in dealing with mental health situations in the community; that is to dispatch police officers whom the city has not instructed on the aspects of Fla. Stat. § 394.463(5) — the unlawful activities relating to examination and treatment — as can be seen in the training slides the defendants have provided to the court.
(reference Doc. 131-1, 1144-1160).

45) No matter **HOW** the city chooses to provide public safety services for people suffering from mental illness (dispatching police, sheriffs, paramedics, firefighters, ext.), the city has a duty to make sure the service that is dispatched is trained to adhere to the Baker Act law of Florida, to do otherwise is deliberate indifference because of the foreseeability of the Baker Act's misuse. (§ 394.463(5))

46.) To dispatch services to deal with the reoccurring situation of mental health and yet fail to train those dispatched on the malicious misuse of the Baker Act; that if misused in a malicious way would blatently violate the constitutional rights of individuals, is deliberate indifference to the rights of citizens in the community, a deliberate indifference that directly effected me on 8/17/2020.

Pg. 74 of 126

47) In Section IV, pg. 21 of the defendants motion to dismiss, the defendants state: "the officers cannot be named individually for any negligence claims alleged by Plaintiff pursuant to Section 768.28(9)."

48) I am **NOT** claiming the individual officers acted negligently.

49) I am stating that the individual officers acted in bad faith and with malicious purpose in a manner exhibiting wanton and willful disregard for human rights pursuant to Section 768.28(9)(a)

50) I am stating that the City's negligence in properly training the officers led to a culture, custom, and practice of the acceptance of the officers to act in this malicious manner.

51) In Section V, pg. 25 of the defendants motion to dismiss, the defendants state: "There is no evidence that any officer committed any violation of plaintiff's rights period, let alone that some city policy or custom was the cause of a constitutional violation."

52) In my amended complaint (Doc. 18) I clearly state that upon a noticible change of shift, I watched the officers (behind the police department gates) come to an agreement and then as a group came out to confront me. Furthermore, they (as a unit) surrounded me, physically restrained me, searched me and my property, and even went as far as to delet my facebook video of their malicious actions. These are the facts of the events on 8/17/2020.

53) Through an adequate discovery process it could be possible to retreive the deleted video of the officers actions from either my cell phone or from my facebook account.

Pg. 75 of 126

54) ("While §1983 claims may not be brought against Supervisory officials on a basis of vicarious liability or respondeat Superior, Supervisors are liable under §1983 either when they personally participate in alleged Constitutional violation, or when there is casual connection between actions of supervising officials and alleged Constitutional violation.") Keating V. City of Miami, 598 F. 3d 753 (2010).

55) ("Casual Connection between actions of Supervising official and alleged Constitutional violation may be established, for purpose of holding supervisor liable under §1983, by facts which support inference that supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.") Keating V. City of Miami

56) ("To state civil rights claim against supervisor for failing to stop Constitutional violations committed by his or her subordinate, plaintiff need only allege: ① that supervisor had ability to prevent or discontinue a known Constitutional violation by exercising his or her authority over the subordinate committing that violation; and ② that supervisor subsequently failed to exercise that authority to stop violation.") Keating V. City of Miami

57) ("A §1983 plaintiff cannot rely upon the doctrine of respondeat superior to hold the government liable for an alleged civil rights violation, but must instead establish that the government unit has a policy or custom that caused the injury.") Weiland V. Palm Beach County Sheriff's office, 792 F. 3d 1313 (2015)

P.g. 76 of 126

58) ("For purpose of § 1983 action alleging Constitutional Violation in defendants' supervisory capacity, "Policy" is decision that is officially adopted by municipality or created by official of such rank that he or she could be said to be acting on behalf of municipality; "Custom" is unwritten practice that is applied consistently enough to have same effect as policy with force of law.") Goebert V. Lee County, 510 F. 3d 1312 (2007)

59) In Section IV, pg. 21 of the defendants motion to dismiss, the defendants state: "law enforcement activities and public safety are government duties that are owed to the public generally." This statement refers to a public duty doctrine.

60) However, the Florida Supreme Court explicitly held that the public duty doctrine has no continuing vitality under Florida law subsequent to the effective date of Fla. Stat. § 768.28. See Commercial Carrier Corp. V. Indian River County, 371 So. 2d 1010, 1015 (Fla. 1979)

61) In Trianon Park, 468 So. 2d at 918, the Florida Supreme Court reaffirmed Florida's rejection of the public duty doctrine.

62) Even if the Court considers the Public duty doctrine, the City and its police officers still owed me a special duty due to physical restraint and/or custody, as I have explained in Section D (III)(c) of this responce.

63) My amended Complaint does not state a claim under Federal law for the respondeat superior theory.

64) My amended Complaint (Doc.18) clearly states that the Culture, Custom, and practice of the police officers was the moving force behind my Constitutional and Statutory violations.

# V.) False Arrest Claim

I have stated a valid claim for false arrest under both state and Federal law.

1.) In Section V, p.g. 21 of the defendants motion to dismiss, the defendants state: "Plaintiff was never actually "arrested", but instead was placed in confinement under the Baker Act which does not provide a Constitutional claim or any claim of false arrest... in fact... no arrest occurred."

2.) The defendants seem to misunderstand the difference between False arrest and malicious prosecution.

3.) Arrest is defined as a seizure or forcible restraint; The taking and/or keeping of a person in custody (especially) by legal authority. (Black's Law Dictionary, 11th edition)

4.) ("It seems apparent that detention accompanied by handcuffing, drawn guns, or words to the effect that one is under arrest qualifies as an 'arrest' and thus requires probable cause." Charles H. White-bread, Criminal Procedure § 3.02, at 61 (1980)

5.) Malicious prosecution is defined as a judicial proceeding, instituted by one person against another from wrongful or improper motives, and without probable cause to sustain it. (Black's Law Dictionary, 11th edition)

6.) What the defendants mean to say in Section V of their motion to dismiss, is that criminal court proceedings were not initiated. This is not in dispute here.

7.) What is in dispute is the physical restraint by officers and further malicious choice to use the Baker Act without probable cause and in retaliation to my 'sit and wait' peaceful protest.

P.g 78 of 126

8.) The defendants attempt to claim that the United States constitution does not apply to Florida's Baker Act law. This is False.

9.) I have already pointed out in Section D (iii)(8)(13) of this responce (where I reference Watkins V. Bigwood), that to lawfully detain under Florida's Baker Act law, Probable cause must have existed.

10.) The defendants reference <u>Bright V. Thomas</u>, 754 Fed. Appx. 783, 786 (11th Cir. 2018) to support their claim that probable cause is not needed for a Baker Act. But, the defendants are incorrect, in <u>Bright V. Thomas</u> "arguable probable cause was found to detain and commit arrestee under Florida's Baker Act."

11.) The defendants reference <u>Collins V. State</u>, 125 S. 3d 1046, 1048-49 (Fla. 4th DCA 2013) to support their claim that probable cause is not needed for a Baker Act. But, the defendants are incorrect, in <u>Collins V. State</u> officers were found to have "acted reasonably and in good faith," which is the requirements for arguable probable cause under the fourth amendment.

12.) Furthermore, "as the constitution of the United States is the supreme law of the land, anything in the constitution or statutes of the states to the contrary not withstanding, a statute of a state, even when avowedly enacted in the exercise of its police powers, must yield to that law." <u>Dobbins V. City of Los Angeles</u>, 195 U.S. 223, 237, 25 S. Ct. 18, 49 L. Ed. 169 (1904)

13.) In Section I., p.g. 23 of the defendants motion to dismiss, the defendants clearly state: "acording to the Baker Act, Fla. stat. Section 394.463(1) and (1)(b)(2)," "a person may be taken to

a receiving facility for involuntary examination **if there is reason to believe** that the person has a mental illness and because of his... mental illness... there is a substantial likelihood that without care or treatment, the person will cause serious bodily harm to himself... or others in the near future as evidenced by recent behavior."

14.) My amended complaint (Doc. 18) clearly states that the officers had no probable cause. This means they had no reason to believe that I had a mental illness or that because of that illness (and without care or treatment) I would cause serious bodily harm to myself or others.

15.) In Section Ⅴ., p.g. 23 of the defendants motion to dismiss, defendants state: "a police officer is required to take a person into custody if the person merely "appears" to meet the Baker Act criteria stated above."

16.) Exept that officers don't provide what it was that met the criteria for a Baker Act on event report ID#2020-39535.

17.) In fact, the 'Remarks' section of the 'Field Contact' form of the Leesburg Police department simply states in a conclusory fashion: "Subject displayed behavior and made statements that met criteria for Baker Act." (reference case #20-08-0242)

18.) In the 'Accessories' section of the same 'Field Contact' form, the officers simply write: "Broom stick and a ball on a rope. Subject continuously swung ball around on a rope."

19.) If this was the criteria that meets the Baker Act requirements, then children, teens, and sports fanatics at parks across Florida are in true danger of being subjected to involuntary examinations.

p.g. 80 of 126

20) Officers do not state what statements were made or what behavior displayed mental illness that <u>without care or treatment</u> would lead to serious bodily harm to myself or others.

21) The statements in the field contact form obviously do not meet the requirements for Florida's Baker Act, again proving that officers did not have even arguable probable cause to initially arrest or further to detain me pursuant to the Baker Act.

22) In Section V, pg. 24 of the defendants motion to dismiss the defendants state: "if an imprisonment or arrest is under legal authority (here Florida statute, known as the "Baker Act") it, by definition, cannot be "false". This statement is false; not to mention that the defendants just contradicted their own argument by stating that the Baker Act is an arrest under legal authority.

23) With the mindset of the defendants in the statement above (in #22) the torts of false arrest, false imprisonment, malicious prosecution, and deprivation of due process against police officers would be moot and void.

24) The entire purpose of a §1983 complaint is to bring action against officials whom acted "under color of law", which means "under legal authority".

25) In Section V, pg. 24 of the defendants motion to dismiss, the defendants claim that: "legal authority is shown by valid process even if that process is later deemed irregular or voidable."

26) The established arrest process required by the Fourth Amendment or the validity of the Baker Act statute are not in dispute here.

27.) What is in dispute is the culture and customs that led to the actions taken by the police officers, which did not meet the standards of the Fourth Amendment or Florida's Baker Act statute.

# VI.) Disputed Material Facts from defendants

## A.) My Testimony (see Attached affidavit, Exhibit "B")

1) I dispute the facts presented by the defendants in their 5/1/2025 motion to dismiss.

2.) On 8/17/2020 after I peacefully waited for hours in the LPD parking lot for the evidence/property department to open; and after I refused the officers request for me to leave without my property; multiple officers came out from behind the police fence in what seemed like a show of force, therefore I started "live" recording on my cell phone.

3.) First was a uniformed LPD caucasian male with salt and pepper hair about in his 50's (whom I presume was she'ild #1009 (T27) and whom has yet to be identified. He came up to me with blue medical gloves on and (without any warning, command, and/or conversation) took me by my left wrist.

4.) Another uniformed hispanic LPD male with dark hair snatched my cell phone from my right hand while I was recording. Two other caucasian male officers searched my car while the rest assisted the first one (with salt and pepper hair) in searching and restraining me.

5.) It was not until they had finished restraining me and searching me and my car that one of them finally answered my repeated demand to know why I was being arrested by informing me that I was being Baker Acted.

pg. 82 of 126

6.) I told the officers that I did not meet the criteria for a Baker Act, since I was of right mind in knowing time and place; and I was not a threat and/or danger to myself or others. Yet my comments fell on deaf ears.

7.) The officers gave me no reason for why they thought I was in immediate need of involuntary examination; Nor did they ask me if I would agree to such an examination pursuant to Fla. Stat. § 394.463(1)(a)(1).

B) <u>Disputes over Baker Act report by Paonessa</u>

1.) The Baker Act documentation by defendant Paonessa has a mix of false statements and accusations against me.

2.) The false statements and/or disputed facts are:

   A.) At no point did I hit a fence with my staff (long stick).

   B.) At no point did I make obscene statements at police officers.

   C.) There were no reports of me "carrying weapons" or of me "making threats".

   D.) At no point did I make "irrational statements." I said nothing of the government is after me or that they are spying on me.

3.) In the Baker Act documentation Paonessa includes accusations for other incidents by stating that, "Multiple reports of Angel carrying weapons and making threats have been made." Yet Paonessa does not provide these alleged reports of weapons and threats on 8/17/2020. Neither are there any witnesses listed in the Baker Act documentation, in the field contact card, or in the event ID # 2020-39535/case # 20-08-0242; under Exhibit "A-9." To clarify, there were <u>NO</u> reports of me carrying weapons or of me making threats on 8/17/2020; this is to include in the reports by Dagostino and Sommersdorf

P.g. 83 of 126

4.) The Baker Act documentation has no testimony by either Lamoreaux or Carter (they are not listed as witnesses) even though Lamoreaux writes the field contact report under the supervision of Carter; Neither give <u>any</u> of the false statements in the affidavits that they are now presenting. To clarify, <u>None</u> of the testimony now being presented by Lamoreaux or Carter was used for the Baker Act.

5.) The defendants are using "other events" that did not occur on 8/17/2020 and their animosity towards me to establish arguable probable cause for their malicious Baker Act.

6.) In the Baker Act documentation Paonessa subjectively describes me being upset as "irate". Irate is a stronger subjective way to say "angry" and/or "upset". Dagostino also subjectively describes me being upset earlier that morning by reporting on event report ID #2020-39522 (under Exhibit "A-7") that, "Subj was not happy Adv. he is not leaving till he gets his property." Two seperate officers; one acted in bad faith by subjectively declaring me upset without reason and even further declared a false medical emergency. The other acted in good faith by also subjectively declaring me upset, but this officer states the actual reason why I was upset, reports it, verifies that all is safe (No danger), and clears the call as complete without any issue or claim of any "strange behavior" or "threats" or "immediate danger to myself or others".

7.) Paonessa provides <u>NO</u> testimony or report by the EMS personel who transported me or by the LRMC Hospital staff who tested me for Covid-19. Note: The "Baker Act emergency facility" was at Life Stream, not LRMC Hospital.

P.g. 84 of 126

C.) Dispute over Dagostino's Affidavit and Sommersdorf Affidavit

1.) When Dagostino responded to my request for a Police Officer, he informed me that though the Police department is always open, the property/evidence section of the department was closed and I could retrieve my property in the morning when the property department opened.

2.) I informed Dagostino that I was not leaving without my Property.

3.) Dagostino locked the lobby doors of the Police department and left me outside in the parking lot. I asked Dagostino if I was breaking any law by remaining in the parking lot of the Police department and he said, "NO."

4.) That Dagostino locked the doors and left me in the parking lot is confirmed by Sommersdorf when he reports that, "Doors to PD STILL locked." As in, they were locked before and "STILL" continue to be locked. (reference event ID #2020-39525, under Exhibit "A-8")

5.) Dagostino does not report any blocking of doors, any fire hazards, or any type of barricading of the lobby doors. Nor does Dagostino report any "Strange behaviors" in event ID #2020-39522, under Exhibit "A-7."

6.) Dagostino simply tells the truth in good faith; that I was there in regards to my property, that I was not happy, and that I was not leaving without my property.

7.) The chair moving event described by Sommersdorf (the moving of chairs in order to lay down on them while waiting in the Police department lobby) was not on 8/17/2020; even more, on the day it did happen there was no dispute over the chairs. I followed the officers instructions and put them back and continued to wait in the lobby.

Pg. 85 of 126

8.) Another way to confirm this "chair moving" event was on another day is Sommersdorf affidavit testimony that, "another officer told him to put the chairs back in place." Yet in the exhibit "A-8", event report ID #2020-39525 dispatch only has unit "T-37" on scene the morning of 8/17/2020, No other officers. Sommersdorf doesn't even bother to name the "other officer" because there was no other officer on this call on 8/17/2020.

9.) Though Carter's affidavit does not name Sommersdorf as the "night shift supervisor", the use of the same chair moving event from a different day/event confirms that Sommersdorf was part of the decision process and/or agreement to take me into custody under the Baker Act.

10.) I do concede that Dagostino was not involved in the agreement or decision process to take me into custody under the Baker Act, nor did he participate physically in effectuating the Baker Act.

11.) I still point out that on 8/17/2020 (under Exhibit "A-8", report for event ID #2020-39525) Sommersdorf does Not report or even imply of any "strange behaviors", irrational comments, threats, or dangers to myself or others.

12.) I ask the Court to consider Sommersdorf and Dagostino's reports on 8/17/2020 in the circumstances of how reasonable officers would objectively respond to my request for my property on 8/17/2020; even when I refused to leave the police property by exercising my First Amendment right to express my dissent with the LPD by sitting and peacefully waiting for the property section to open.

Pg. 86 of 126

D.) Dispute over Carter's Affidavit

1.) Carter (in bad faith) plays with words in his affidavit and Commingles other events into the 8/17/2020 testimony (most of which were after this Baker Act) in order to deceive this Court with an excuse for arguable Probable Cause. I clarify and breaks down Carters deception to this court.

2.) Carter Starts by testifying about the "chair moving" event, yet he did <u>not</u> witness this alleged event, nor does he know or try to name who is the "other officer" who "told him to put the chairs back." Carter falsely testifies in the First Person (as if he was an eye witness) that, "He was dragging chairs and blocking exit doors and acting strangely." When in <u>Fact</u> Carter did <u>Not</u> witness this event at all. In Fact, all Carter states is that the night Shift supervisor informed him that I was in the lobby. Carter does <u>not</u> state that the night shift supervisor tells him the above declared Statement of moving chairs, blocking exits, and acting strangely; and he gives credit to an unknown officer telling me to put the chairs back. Even then there is <u>NO</u> allegation of a dispute over the chairs.

3.) Carter falsely testifies and/or implies that I was in the lobby of the Police department during a civilian shift change. <u>That is False</u>. Carter states, "After going outside of the lobby, during a civilian shift change..." Yet the doors to the lobby had been locked for several hours, (reference Exhibit "A-8", event ID# 2020-39525) Sommersdorf reports that, "Doors to PD <u>Still</u> locked."

Pg. 87 of 126

4.) Carter testifies that, "the records clerk and other female employees expressed concern and fear over his behavior" Yet none of them present themselves as witnesses in any documentation, nor are there any "Concerned employees" even mentioned in any reports. (This event is on 8/28/2020, see exhibit "A-12")

5.) "Mere public intolerance or animosity cannot Constitutionally justify the deprivation of a person's physical liberty." O'Connor V. Donaldson, 422 U.S. 563 (1975)

6.) Carter is the only defendant who falsely testifies or even mentions that I "was wearing a hockey mask." At no point did I wear any mask on 8/17/2020. I was criminally charged with wearing a mask by this same Police department on 10/27/2020. But I did not wear any mask on 8/17/2020. Carter is commingling multiple events in bad faith to try to paint a "bad picture" for the Court on 8/17/2020, at the risk of court sanctions for misleading the court and testifying falsely under oath about the false Baker Act Confinement. (see Exhibit "A-16")

7.) At No point did I bang the Police department fence with a long stick.

8.) I did not use abusive language with or toward the Police. I may have been direct and stern, but I did not threaten nor did I use abusive language.

9.) At no point did I jump on and/or destroy the flower beds of the City Police department.

Pg. 88 of 126

10.) Jumping on and/or destroying flower beds is considered criminal mischief, yet defendants provide no evidence for nor do they criminally charge me with criminal mischief for the purposeful destruction of flower beds on city property.

11.) Carter proves his animosity towards me by testifying of his subjective opinion about me and commingling other events into this incident; _none_ of which happened on 8/17/2020. Testimony by Carter that did not happen on 8/17/2020 was:

A.) The reason they did search my car is because the, "Plaintiff is known to keep a multitude of weapons on his person and in his vehicle displayed in a concerning manner, <u>on more than one occasion</u>." But this was <u>not</u> the case on 8/17/2020. Carter uses this testimony to justify arguable probable cause for declaring a medical emergency, rather than just returning my property to me.

B.) Carter states, "He also has made multiple threats to police officers, so much so that any calls involving Mr. Gaston usually is assigned extra back-up due to officer safety concerns." But on 8/17/2020 I had made no threats to officers. Animosity for past events does not justify declaring a medical emergency for an involuntary examination pursuant to the Baker Act law. Under this reasoning the officers are using the Baker Act as punishment for past events.

Pg. 89 of 126

12.) Things I did do are:

A.) I did refuse to leave the Police department without my property (my prescribed medical marijuana and accessories).

B.) I did have my car doors open with music playing.

C.) I did exercise with my Staff/long stick in the empty parking lot.

13.) None of the things mentioned above (in #12) give rise to even arguable probable cause to think a mental health emergency needs to be declared due to a mental illness which was in need of an immediate involuntary examination.

14.) Since this entire incident on 8/17/2020 is at the Leesburg Police Department, defendants could have easily provided video footage from their building Security Cameras (which were installed in 2003) to show the alleged concerning and Strange behavior of moving chairs, wearing mask, jumping on flower beds, and banging on the fence. But defendants cannot provide this video footage because these events did not happen. Therefore defendants did not and could not provide such video footage.

15.) Because the defendants acted in bad faith they don't bother with providing witnesses of or even a good description of the circumstances that led to the Baker Act. Please compare the event report of a reasonable Sumter County Sheriff (Patrick Flynn) acting in good faith and in similar circumstance (under Exhibit "A-2", SCSO FIR-010388) to the bad faith short report of the Baker Act by defendants.

P.g. 90 of 126

E.) <u>Dispute over Escalante's Affidavit and Liston's Affidavit</u>

1.) Escalante is testifying in bad faith in order to hide his involvement in the False Baker Act. Escalante states that all he did was "call in over police radio that a Baker Act decision had been made, and that plaintiff would be transported accordingly." Yet in the next breath Escalante contradicts his statement by now saying, "I had <u>no role</u> in the decision made by other officers who had taken plaintiff into custody pursuant to the Baker Act... nor did I participate physically in effectuating the Baker Act." Yet he admits to participating by calling over police radio that, "a Baker Act decision had been made." How would Escalante know a Baker Act decision had been made if he did not participate in such decision? Why would he be the one who let dispatch know of the transport arrangement if he was not a part of this decision? Even more, why does dispatch report (in the event ID log #2020-39535, under Exhibit "A-9") that it was actually T-9 (Lamoreaux) who actually made the transport radio calls to dispatch and T-14 (Carter) who informed dispatch, "Subj Detained"? Where is Escalante in the dispatch report?

2.) I presume that Escalante is actually the officer who snatched my cell phone from my right hand and deleted my video of this malicious event.

p.g. 91 of 126

3.) Defendants make no effort to clarify who is sheild number 1009 (T-27). Because T-27 has an older sheild number (#1009) I presume T-27 was the officer with salt and pepper hair who wore the blue medical gloves. This officer was the lead officer and the first to restrain me by my left wrist.

4.) John Liston (T-16), whom is reported by dispatch as assisting in this event (reference exhibit "A-9", Event ID #2020-31535), I presume was one of the officers who assisted in illegally searching my car and found nothing to charge me with a criminal action.

## F.) Dispute over Lamoreaux's Affidavit

1.) Lamoreaux is (in bad faith) commingling multiple incidents with me (most of which were after this Baker Act) into his testimony of this Baker Act on 8/17/2020 in order to deceive the court of an excuse for arguable probable cause. Malicious and/or acts of bad faith are not protected by qualified immunity.

2.) Lamoreaux testifies about an incident at another property (the Lee Adult Academy) on another day (not 8/17/2020) were multiple officers were sent out due to safety concerns and alleged threats against police. Again I clarify, the incident described by Lamoreaux was at another property and not on 8/17/2020.

3.) Lamoreaux uses his animosity towards me because of this and other incidents to justify declaring a medical emergency on 8/17/2020 pursuant to the Baker Act. Vengeance and punishment is not what the Baker Act was

P.g. 92 of 126

created for, hence the reason for this present complaint and the warning from Fla. Stat §§ 394.463(5) to avoid this type of event/action.

4.) Lamoreaux further testifies that, "During __many__ interactions with police, Plaintiff is known to have and displayed multiple weapons, exhibit strange and at times delusional/paranoid behaviors and even make verbal threats to police, at least one time stating that he would kill officers who aren't doing their jobs correctly." __None__ of this testimony is alleging any acts on 8/17/2020. The assault on the officer that Lamoreaux is refering to was in 2017.

5.) Lamoreaux is simply stating his animosity towards me and his subjective malicious reasons for declaring a medical emergency to have me forcefully removed from the property without returning my prescribed medication and accessories to me.

6.) Lamoreaux further testifies to my knowledge of karate. I concede that I do practice traditional Japanese Martial Arts (Shito-Ryu Karate-Do). Yet having knowledge of martial arts is not a reason to declare a medical emergency and/or Baker Act someone. LPD has known of my martial arts practice in every encounter we have had, Yet out of all of the "incidents" I have had with LPD I have never become physically violent nor have I ever resisted arrest with violence; that is not to say I have not disagreed with and/or disliked officers I have encountered. Some are good and some should not be police officers.

7.) Lamoreaux goes on to testify of other events where officers encountered me while I was wearing my karate uniform/Gi; again events that did <u>not</u> happen on 8/17/2020. Lamoreaux continues by testifying of, "displaying swords and other weapons both on his person and in his car." Again events that did <u>not</u> happen on 8/17/2020. This testimony is of pure animosity and show why they searched my car, they were looking for weapons, but I didn't have any.

8.) Lamoreaux continues by falsely declaring me to be a "former 'special ops' member" and that it was my mother who told them that information. Again he is <u>not</u> saying that my mother contacted them on the morning of 8/17/2020. I concede that I did serve in the U.S. Air Force (not as a "special ops" member) as a fire fighter. I have never declared or held myself out to be a "special ops" member, not on 8/17/2020 or any other day. Lamoreaux is using the alleged declarations of an un-named woman from an un-known date (not on 8/17/2020) to defend his excuse to declare a medical emergency pursuant to the Baker Act. This is the type of situation that Fla. Stat. § 394.463 (5) warns against.

9.) Lamoreaux is one of the defendants testifying about the, "Plaintiff's mother"; whom he does not provide a name for or a time and date of when she allegedly spoke with an unknown person generalized by Lamoreaux as "Police". Lamoreaux provides no call report, no event ID, no date, no name (for the mother), and not even the individual who allegidly spoke with "the mother" about the erratic behavior.

Pg. 94 of 126

10.) Lamoreaux only declares that at some point and "on occasion" she (the mother) would "warn them of his erratic behaviors." Again I clarify, this alleged contact by "Plaintiffs' mother" was <u>not</u> on the morning of 8/17/2020 (In fact Lamoreaux does <u>not</u> say when this alleged contact happened.). But what is known is that her alleged "warning" is <u>not</u> considered for this Baker Act. (reference Report of Law Enforcement Officer Initiating Involuntary Examination by Paonessa.)

11.) Lamoreaux (in bad faith) plays with words and commingles events in his affidavit in order to deceive this court. I clarify and break down this deception:

A.) Lamoreaux states, "I observed Plaintiff in front of the lobby of the police department." This is true because the lobby doors were locked by Dagostino hours earlier and I sat and waited in the police parking lot.

B.) Lamoreaux continues by stating, "After he was dragging chairs and blocking exit doors, and acting strangely." But Lamoreaux is testifying to something he did <u>NOT</u> himself witness. Lamoreaux arrived in the morning for the day shift change. Dagostino had locked the lobby doors hours earlier (at 2:14 am) and Sommersdorf confirms the lobby doors are "still locked" (at 3:44 am). How then does Lamoreaux witness me "dragging chairs and blocking exit doors, and acting strangely" in a lobby that has been locked for hours? Lamoreaux is testifying in bad faith (and under oath) to justify arguable probable cause for the Baker Act.

Pg 95 of 126

C.) At no point did I strike the gates the officers were standing behind with my staff/long stick. That is called assault on Law enforcement officers and would have completely defeated the point of all the hours I peacefully sat and waited in protest to retrieve my property.

D.) At no point did I "jump in and out" or even on the flower beds, nor did I use verbally abusive and/or vulgar language with or toward police.

12.) I do concede that during the early morning hours and before I noticed officers arriving for a shift change, I was exercising and/or practicing with my staff some martial arts Kata/forms in the empty parking lot of the police department. This is what Lamoreaux describes as "standing outside with a large broomstick, waiving it around frantically." Exercising and/or practicing Martial Arts forms in an empty parking lot does not qualify anyone for a medical emergency pursuant to the Baker Act, especially when I stopped my staff exercise because I noticed the gathering of the officers behind the police gates and was expecting to go collect my property.

13.) I do concede that I refused to leave without my property and that I did accuse them of wrongfully confiscating my property/prescription medical marijuana; which they removed from my vehicle though they were legally carried in their medical containers and properly labelled.

Pg. 96 of 126

14.) At no point in his entire affidavit does Lamoreaux state the circumstances for and/or reason why I was at the Police department. To clarify, I was retrieving my wrongfully taken property/medical marijuana prescription and accessories.

15.) I concede that the wrongfully taken property that was maliciously taken from my vehicle by LPD officers on a previous arrest for criminal mischief on 8/14/2020 (charge dropped by the State) was my legal medical marijuana prescription along with all of my consumption accessories (to include my medically approved pipes, grinders, and rolling papers.) LPD had no authority to confiscate my medical prescription or my consumption accessories from my vehicle. They were carried legally and properly labelled. Eventually, (after the Baker Act) my property/prescription was returned to me.

16.) Lamoreaux (for a second time) testifies that, "Plaintiff is known to keep a multitude of weapons on his person and in his vehicle, displayed in a concerning manner, on more than one occasion." But again I clarify that this is not testimony about the event on 8/17/2020. Lamoreaux is using other events (see Exhibit "A") and his animosity towards me as an excuse for declaring a medical emergency pursuant to the Baker Act.

17.) Lamoreaux (for a second time) testifies that, "He also has made multiple threats to police officers, so much so that any calls involving Plaintiff are usually assigned extra back-up due to officer safety concerns." But again I clarify that

this Statement/testimony is not about the event on 8/17/2020. Lamoreaux is Stating generalities of other events, their operational plans in dealing with <u>any calls</u> involving me, and his animosity towards me through multiple interactions. NO, Lamoreaux and I are not friends nor do we like and/or agree with each other, but that does not mean that Lamoreaux may (with the assistance of fellow officers) unnecessarily submit me to an immidiate involuntary mental health evaluation for a false mental health medical emergency. Lamoreaux is again attempting to deceive the court for the excuse of arguable probable cause needed for the Baker Act on 8/17/2020 by providing generalities of multiple events and Several interactions, <u>None</u> of which occurred on 8/17/2020.

18.) Lamoreaux States that the officers that witnessed my alleged "behavior" discussed and agreed to take me into custody under the Baker act. Yet the only officer willing to admit to this discussion and agreement to Baker Act is Carter. All other officers whom were there for shift change that morning or were reported on the event report deny having any discussion or even being a part of the Baker Act decision. So which officers (plural) is Lamoreaux refering to? According to the official Baker Act documentation there were NO witnesses and/or witness Statements. According to Fla. Stat § 394.463; the Statements in the Baker Act documentation is what justifies the Baker Act, <u>Not</u> alleged actions 5 years later.

P.g. 98 of 126

19.) Lamoreaux testifies that my, "increasingly strange and concerning behavior met the Baker Act criteria." Yet there are NO reports from the EMS personel who transported me to the LRMC Hospital. There are no reports from the nurses, hospital staff, or security at the LRMC Hospital witnessing this alleged "strange and concerning behavior" that was in immediate need of examination pursuant to the Baker Act. If this alleged behavior was so obviously in emergency need of treatment, then someone other than the LPD officers must have also seen it. Yet, there are NO reports by any EMS personel who according to event ID #2020-39535 (under exhibit "A-9") transported me to the LRMC Hospital at 7:05am. Even while at the LRMC Hospital someone must have noticed this "increasingly strange and concerning behavior that met the Baker Act criteria." Yet all transport from 6:41am until drop off and clearing of call by police officers at 9:42am (Location: Lifestream) goes without any incident; a full 3 hours without a single call for help by EMS or LRMC to handdle and/or assist with this mental health emergency of "increasingly strange and concerning behavior."

20.) Defendants in this responce and motion to dismiss provide NO reports from anyone that is not LPD. No report from EMS personel or LRMC Hospital staff for the 2 hours and 20 minutes that they had me in their medical custody, after LPD declared a medical emergency (from 7:05am-to-9:41am), reference event ID #2020-39535, under exhibit "A-9."

P.g. 99 of 126

21.) Would not this Mental health medical emergency be reasonably recognized by EMS transport or hospital Staff? Yet they make no reports and simply release me back into LPD custody because there was NO medical/mental health emergency. If there was an emergency EMS transport and LRMC staff had a duty to give and/or recomend treatment (Pursuant to Fla. Stat § 394.463 (2)(a)(3)) —or— at the very least log and/or report this emergency before releasing me to LPD custody. Yet this court will find no such report by EMS transport or LRMC hospital Staff because there was NO Such emergency.

22.) The Truth is LPD officers were not expecting to have to call EMS to transport me to the LRMC Hospital in order to get a Covid-19 Test before being admitted to Lifestream for the "Baker Act." The officers had based the Baker Act only on their false testimony, when in fact the lack of reports and testimony from EMS personel and LRMC hospital staff during the 2hours and 20 minutes I was with them proves that I in fact was not suffering from a mental illness that required an immidiate declaration of a mental health emergency and admission for an involuntary examination.

Pg. 100 of 126

G.) Dispute over Romanelli's Affidavit and Iozzi's Affidavit

1.) Both Romanelli and Iozzi present almost identical affidavits with only minor differences; and just like the other defendants Romanelli and Iozzi give no testimony as to why I was at the police department the morning of 8/17/2020.

2.) Both Romanelli and Iozzi start by stating that, "the City has in place a policy regarding appropriate procedure for taking an individual into custody under the Baker Act, contained in chapter 394 Florida Statutes." This means that neither the officers or the city have the "discretion" (in the legal definition of the word, as in, legislative and/or executive power) to establish and/or deny the policy and procedures contained in Fla. stat. §394. The City and its officers are in fact operating under the policy and procedures already established by the Florida legislators in Fla. Stat. §394, therefore they do not have discretionary immunity for operating under these policies and procedures.

3.) The City Policy attached as Exhibit "A" of Romanelli's and Iozzy's affidavits (Doc. 118-3; 964-970 and Doc. 118-3; 995-1000) do not include any information, policy, or procedures on the section the Florida legislation has titled, "Unlawful Activities Relating to Examination and Treatment; Penalties" also known as Fla. Stat. §394.463(5). (See Section submitted by defendants titled "Authority to Arrest," section 2.5 of City Policy; Limits on Authority and Jurisdiction)

p.g. 101 of 126

4.) The "additional training in Baker Act procedures" provided by Romanelli and Iozzi in their affidavits under Exhibit "B" (Doc. 118-3; 971-989 <u>and</u> Doc. 118-3; 1001-1019) also <u>do not</u> provide any information, policy, or procedure on Fla. Stat. § 394.463 (5) for officers to be advised on the limits of the Baker Act.

5.) The exhibits (discussed above in #3 and 4) provided by the defendants prove my complaint against the city to be correct. The City has not advised and/or trained its police officers on the foreseeable misuse of the Baker Act.

6.) Throughout their motion to dismiss the defendants claim and argue that a Baker Act is <u>NOT</u> an "arrest." Yet in the city policy documentation provided by the defendants the Baker Act is under section "<u>2.0 Authority to Arrest</u>." (See Doc. 118-3; 966-969 and Doc. 118-3; 996-999).

7.) Neither Romanelli or Iozzi testify (in their affidavits) to the events on 8/17/2020. Both Ramanelli and Iozzi simply provide a laundry list of the reasons the LPD officers hold strong animosity towards me.

8.) Section 4 of both Ramanelli's and Iozzi's affidavits cover "<u>multiple encounters</u> between Plaintiff and Police both <u>before</u> and <u>after</u> August 17, 2020." <u>But Not On 8/17/2020</u>. I incorporate the responces I have given against officer Lamoreaux due to the verbatim use of accusations by all 3 defendants.

Pg. 102 of 126

9.) Both Ramanelli and Iozzi try to use the commingling of other events to justify arguable probable cause for LPD officers declaring a false medical emergency pursuant to the Baker Act on 8/17/2020. But vengeance and/or punishment for someone the officers do not like is **Not** what the Baker Act was created for. In fact, the legislators created Fla. Stat. §394.463(5) to warn against and prevent this exact foreseeable misuse of the Baker Act.

10.) Both Romanelli and Iozzi admit to being present at the police department during my Baker Act on 8/17/2020, but both falsely claim they had no (direct or indirect) role in the decision to take me into custody persuant to the Baker Act. Yet both Romanelli and Iozzi provide almost a carbon copy of the same excuses and multiple events given by defendant Lamoreaux as the reasons for declaring the medical emergency. As all defendants have stated, I had a negative history and/or relationship with the officers at LPD; and with their affidavits the defendants only confirm the officers animosity towards me on 8/17/2020.

11.) As I have stated in my complaint; on 8/17/2020, after peacefully waiting for hours in the police parking lot (without any incident) I watched a group of police officers gathering behind the gates for what seemed to be a begining of shift meeting. A few (about 3) of them came

out to inform me that the property department was closed. I informed them that I would wait until it opened to retrieve my property. So they (the uniformed officers) went back to the rest of the group behind the gate. After several minutes of a visible discussion with the group, a larger number of officers came out from behind the gates and without warning seized and searched me and my car.

12.) Iozzi tries to deceive this court into thinking that it was the staff in the records department (staff who is unnamed and unknown) who informed him I was outside in the parking lot of the police department; and then he allegedly saw me through a window, "looking as though he may been acting erratically." This testimony is False and unreasonable. I present Iozzi's title ("Commander of Road Patrol") as evidence.

13.) It is unreasonable to believe that the night shift Police Supervisor would not have informed the incoming morning Commander of Road Patrol that an individual whom they are all firmiliar with has been waiting in the parking lot (for hours) for the property department to open in order to retreive property that was confiscated by officers.

14.) It is unreasonable to believe that Iozzi (as the Commander of Road Patrol) did not know a group of his subordinate officers were going out to the parking lot to confront an individual with "allegedly" multiple

P.g. 104 of 126

black belts in various forms of Karate; an "alleged" ex-special forces member whom is "allegedly" Known to be armed with multiple weapons and whom "allegedly" has threatened to kill LPD officers after "allegedly" expressing paranoia and irrational thoughts. This individual for whom his "alleged" mother has "allegedly" contacted the Leesburg Police department to warn the officers of many of this individuals behaviors and "alleged" medical conditions; an individual for whom many of the road patrol officers have interacted with and "allegedly" know him as one who "allegedly" often has delusions. This is the individual who has been waiting for police officers to arrive in LPD's parking lot; right outside Jozzi's window.

15) It is unreasonable to beleive that after all of this laundry list of accusations both Jozzi and Romanelli still had the nerve to testify under oath that though they were present, they played NO part (directly or indirectly) in any decision to Baker Act me; heck, they are implying that they barely knew I was outside in the parking lot. The deception is obvious because if all of these things (mentioned above in #14) were true and I was suffering from mental illness that needed immediate medical attention, then why hide and/or deny being involved?

p.g. 105 of 126

16.) Both Romanelli and Iozzi are testifying in bad faith regarding this false medical emergency in order to distance themselves from liability for actions taken in Bad Faith. They both provide as testimony multiple seperate events from different dates to falsely present me as the "Bad guy being irratic and having delusions." Yet they avoid any mention of the actual reason for why I waited for hours in the police parking lot (without incident).

17.) Rather than Baker Acting me (Aka, declaring a medical emergency due to an immediate need to treat a mental illness) the LPD officers should have simply returned my prescribed medical marijuana and accessories (which they returned after I was released from the Baker Act) and let me be on my way. But that is not how pride works; and from the looks of this extensive experience, they have done this before and Never been held accountable for their malicious use of the Baker Act. This is the result of unchecked Police Power.

18.) I concede that not every officer who was in the group behind the gate came out to search and arrest me, but it is unreasonable to believe the Commander of Road Patrol (Iozzi) and the training Lieutenant (Romanelli) would not be a part of an incident that is interupting the uniformed Road Patrol officers morning meeting. Romanelli, Iozzi, and the Police Chief were in the larger group behind the police gate/fence that came to the decission and/or conclusion to declare a medical emergency and/or Baker Act me.

19.) Iozzi was <u>not</u> the Leesburg Police Chief on 8/17/2020. As Iozzi states in his affidavit, "At the time of the incident alleged in plaintiff's complaint, I was in the position of Commander of Road Patrol."

20.) The Leesburg Police Chief on 8/17/2020 has <u>Not</u> submitted an affidavit with his testimony. It was the duty of the Police chief to stop his subordinates from maliciously and/or in bad faith declaring a False Baker Act; instead he permitted it.

21.) Defendants Barrett, Ketchum, and Navarro simply state that though they were present on that morning, they had nothing to do with my Baker Act. The group of officers that searched and arrested me was a "group of uniformed Police officers" I remember the characteristics and descriptions of a few of them, which I have given. The rest were just men in a Police uniform. I know that not all of the officers that were standing behind the Police gates came out to arrest and search me, but the officers in the larger group behind the police gate were part of the discussion and final decision to use the Baker Act.

22.) "The allegations that they "filed false affidavits to fabricate probable cause in support of the arrest, indicates that they were acting in bad faith." <u>Soda V. City of Altamonte Springs, No. 609-CV-506-ORL-31KRS, 2009 U.S. Dist. Lexis 93556, 2009 WL 3334184, at *3 (M.D. Fla. Oct. 7, 2009)</u>

Pg. 107 of 126

# VII.) First Amendment Retaliation

1.) In Section IV, pg. 24 of the defendants motion to dismiss, the defendants breifly mention my first amendment claim by stating: "Plaintiff cites to no other substantive right; rather alleges implausible conclusions that the city and/or officers "violated his 1st Amendment and 4th Amendment rights"

2.) As I have pointed out in Section D(II)(A) of this responce, I have properly stated a claim for First Amendment retaliation by the officers when they chose to use the Baker Act without probable cause; and to stop and deter my 'sit and wait' peaceful protest expression against their bad faith policing practices.

3.) ("A plaintiff who brings a retaliation claim under §1983 predicated on the First Amendment must show: ① he or she engaged in constitutionally protected activity, ② the defendant's responsive actions were motivated or substantially caused by the exercise of that right, that is, there was a causal connection between the protected activity and the retaliatory action, and ③ the defendant's retaliatory actions were sufficient to deter a person of ordinary firmness from exercising his or her constitutional rights, that is, the defendants' action effectively chilled the exercise of the Plaintiffs' First Amendment right. U.S.C.A. Const. Amend. 1; 42 U.S.C.A. §§ 1983.") Lozman V. City of Riviera Beach, U.S. District Court, S.D. Florida, August 19, 2014, 39 F. Supp 3d. 1392

pg. 108 of 126

4) My First Amendment retaliation claim is not an implausible conclusion, in fact, I have provided (as evidence) the event reports of two other officers whom (earlier that morning) had permitted me to continue in my 'sit and wait' peaceful protest; Making my claim not only plausible, but very probable.

5) As I have stated in Section D (II)(A) of this responce, my amended complaint (Doc. 18) exceeds the plausibility standard (also known as the Twombly test) for a First Amendment retaliation claim.

6) ("Governments may not prevent protests, punish the exercise of the right under the First Amendment free speech clause to protest peacefully by arresting the demonstrators, nor unduly burden the right by forcing demonstrators to undergo excessive searches that violate the Fourth Amendment. U.S.C.A. Const. Amends. 1, 4") Amnesty Intern., USA V. Battle, United States Court of Appeals, Eleventh Circuit, February 23, 2009, 559 F. 3d 1170

7) ("Peaceful protest is an expressive activity that constitutes protected speech under the First Amendment. U.S.C.A. Const. Amend 1.") Keating V. City of Miami, United States District Court, S.D. Florida, Miami Division, January 20, 2009, 598 F. Supp 2d 1315

8) ("Individual's participation in protest march was protected speech, as required for First Amendment retaliation claim. U.S.C.A. Const. Amend. 1.") Battiste V. Lamberti United States District Court, S.D. Florida, August 11, 2008, 571 F. Supp 2d 1286

Pg. 109 of 126

9.) ("A demonstration is a method of expression that is often entitled to First Amendment protection. U.S.C.A. Const Amend. 1") Shamloo V. Mississippi State Bd. of Trustees of Institutions of Higher Learning, United States Court of Appeal, Fifth Circuit, July 2, 1980, 620 F. 2d 516

10.) ("Police officer's unlawful arrest of protestor for disorderly Conduct without arguable probable cause violated protestor's Protected First Amendment right to protest and film police conduct, since officer arrested protestor to stop him from filming police activities. U.S. Const. Amends. 1, 4") Toole V. City of Atlanta, United States Court of appeals, Eleventh Circuit, December 26, 2019, 798 Fed. Appx. 381

11.) ("Protection of First Amendment is not limited to pure speech, but extends instead to peaceful expression of views by marches, demonstrations or assemblies. U.S.C.A. Const Amend. 1.") Davis V. Francois, United States Court of Appeals, Fifth Circuit, May 28, 1968, 365 F. 2d 730

12.) ("Although peaceful, orderly demonstrations cannot be restricted simply because they create disturbances, the time, place and manner of demonstrations are subject to reasonable regulation. U.S.C.A. Const. Amend. 1") Davis V. Francois (1968)

13.) ("Fear of Serious injury cannot alone justify suppression of free speech and assembly. U.S.C.A Const. Amend. 1.") U.S. V. National Treasury Employees Union, Supreme Court of the United States, February 22, 1995, 513 U.S. 454

Pg. 110 of 126

14) ("Mere public intolerance or animosity cannot be basis for abridgment of constitutional freedoms of free assembly and association. U.S.C.A. Const. Amends. 1, 14.") Coates V. City of Cincinnati, Supreme Court of the United States, June 1, 1971, 402 U.S. 611

15) ("First and Fourteenth Amendments do not permit State to make criminal the exercise of right of assembly simply because its exercise may be "annoying" to some people. U.S.C.A. Const. Amends. 1, 14.") Coates V. City of Cincinnati, (1971)

16) ("To prove Causation, as element of § 1983 First Amendment retaliation claim, a plaintiff must prove that his speech was the "but-for" cause of the allegedly retaliation action, which may be accomplished with proof of: ① an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory act, or ② a pattern of antagonism coupled with timing to establish a causal link. U.S.C.A. Const Amend. 1; 42 U.S.C.A. § 1983.") Lozman V. City of Riviera Beach, U.S. District Court, S.D. Florida, August 19, 2014, 39 F. Supp 3d. 1392

17) If not for my 'sit and wait' peaceful protest expression, officers would not have used the Baker Act to remove me from their property.

18) ("In the absence of proof that the speech of a plaintiff asserting a First Amendment retaliation claim under § 1983 was the "but-for" cause of the allegedly retaliatory action, the plaintiff must show that from the evidence gleaned

P.g. 111 of 126

from the record as a whole the trier of the fact should infer causation. U.S.C.A. Const Amend 1; 42 U.S.C.A. §§ 1983") <u>Lozman V. City of Riviera Beach</u> (2014)

19) In my complaint the defendants used the Baker Act to remove me from their property and stop my "sit and wait" protest, which I had done to express my dissent against their bad faith policing actions in confiscating my property/prescribed medication and accessories from my vehicle. This unnecessary declaration of a medical emergency effectively "chilled" my peaceful 'sit and wait' protest, which had been on going for several hours without incident or imminent physical danger towards anyone.

20.) The only reason the defendants used the Baker Act against me is because I refused to leave the police department parking lot at their request. Therefore, my 'sit and wait' expression of dissent against their actions was the "but for cause" of them falsely declaring a medical emergency pursuant to the Baker Act.

21.) The claim that the defendants acted by knowingly violating the law in "bad faith" alone overcomes "arguable probable cause" because "arguable probable

cause" is part of a qualified immunity defense that protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. See Dalrymple v. Reno, 334 F. 3d 991, 994 (11th Cir. 2003); "when properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al-Kidd, 563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011).

22.) In accordance with DeMartini v. Town of Gulf Stream, 942 F. 3d 1277, 1239 (11th Cir. 2019); The facts in my complaint make it plausible that ① my 'sit and wait' expression of dissent against LPD officers was protected by the First Amendment; ② that the defendants retaliatory declaration of a medical emergency stopped, punished, and effectively chilled my expression of dissent against LPD officers; and ③ my 'sit and wait' protest was the "but-for-cause" of the officers false Baker Act. Therefore, because I have stated these facts and supported them with both direct and indirect evidence, I have stated a claim for First Amendment retaliation.

Pg 113 of 126

23) Hartman V. Moore, 547 U.S. 250, 256, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006) well establishes that the First Amendment prohibits officers from subjecting individuals to retaliatory actions, including false arrests, for speaking out. My Complaint states that the officers retaliated against my 'sit and wait' peaceful expression of dissent outside of their Police department by declaring a false medical emergency against me. My 'sit and wait' protest was my way of expressing my dissent and disapproval of the bad faith policing tactics of the LPD officers. My 'sit and wait' peaceful protest was a form of expression and protected free speech that is protected by the First Amendment.

24) The U.S. Supreme Court has stated: "one who challenges application of statute to conduct which amounts to expression does not have burden of bringing his expression within First Amendment; burden is on his opponent to show that such expression is within one of those narrow areas which by their relation to action partake of essential qualities of action rather then expression and therefore are carved away from First Amendments." United States V. Dellinger 472 F. 2d 340, 1972 U.S. App. Lexis 6620 (7th Cir. 1972), Cert. denied, 410 U.S. 970, 93 S. Ct. 1443, 35 L. Ed 2d 706, 1973 U.S. Lexis 3186 (1973).

P.g. 114 of 126

25) The 11th CCA has concluded that it is "clearly established that an arrest without probable cause to believe a crime had been committed violates the Fourth Amendment." Von Stein V. Brescher 904 F. 2d 572, 579 (11th cir. 1990) The defendants in my case were therefore on notice that their arrest was unlawful because there was no medical emergency to declare a Baker Act.

26) The standard framework for distinguishing legitimate exercises of governmental authority from those intended to chill protected speech is well established. see Mt. Healthy City Bd of Ed. V. Doyle 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). The Plaintiff must first establish that constitutionally protected conduct was a {587 U.S. 423} "'substantial'" or "'motivating'" factor in the challenged governmental action (here, declaring a medical emergency and/or Baker Act). Ibid. If the Plaintiff can make that threshold showing, the question becomes whether the governmental actor (here, the arresting officers) can show that the same decision would have been made regardless of the protected conduct (here, the 'sit and wait' and/or refusal to leave the parking lot) Ibid. If not, the governmental actor is liable. In other words, if retaliatory animus was not a "but-for-cause" of an arrest (here a Baker Act for refusal to leave the police department property), a suit seeking to hold the arresting officer liable will fail "for lack of causal connection between unconstitutional motive and resulting harm." Hartman V. Moore, 547 U.S. 260, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006)

P.g 115 of 126

27.) My actions in exercising my right to 'sit and wait' was what the officers wanted punished by declaring a medical emergency. I did NOT commit any crime. In Nieves V. Bartlett, 587 U.S. 391, 400-04 (2019) the U.S. Supreme Court explained that, although probable cause generally defeats a retaliatory arrest claim, "a narrow qualification is warranted for circumstances where officers have probable cause to make an arrest, but typically exercise their discretion not to do so." Id. at 139 S. Ct. at 1727 In those types of cases, "an unyielding requirement to show the absence of probable cause could pose a risk that some police officers may exploit the arrest power as a means of suppressing speech." Therefore, in Nieves the Supreme Court carved out a narrow exception to "the no-probable-cause requirement." Id. the exception applies "when a Plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." To recap, a 1983 First amendment retaliation claim for an underlying retaliatory arrest will be permitted to proceed where the plaintiff establishes retaliation animus and presents "objective evidence" that he was arrested for certain conduct when otherwise similarly situated individual (committing the same conduct) had not engaged in the same sort of protected speech and/or 'sit and wait' protest and had not been arrested.

28.) I (the plaintiff) have provided objective evidence that I was Baker Acted by the defendants on the morning of 8/17/2020

P.g. 116 of 126

for 'sitting and waiting' in protest of their bad faith policing actions. My objective evidence is the other police reports describing similar circumstances yet none declaring a medical emergency. This includes the police event reports by two separate officers earlier that same morning, an event report by a Sumter County sheriff on 8/13/2020, and the lack of reports by EMS personel or LRMC hospital staff on 8/17/2020. (see reports in exhibit "A")

29) In those events I was not exercising my right to express my dissent through a peaceful 'sit and wait' protest. In the other events I did not refuse to leave, therefore the officers permitted me to leave. That means there was no medical emergency due to a mental illness and no one was immediate physical danger.

30) The only reason and/or "but-for-cause" of the Baker Act on 8/17/2020 was my protest and/or refusal to leave the LPD property without my wrongfully confiscated medical prescription and accessories. My 'sit and wait' protest was the "but-for-cause" of the Baker Act. The officers used their arrest powers to chill and punish my 'sit and wait' expression and grievance against their bad faith policing tactics.

31) The U.S. Supreme Court has stated, "Essential thrust of Federal Constitution's First Amendment is to prohibit improper restraint on voluntary public expression of ideas; First Amendment sheilds person who wants to speak or publish when others wish person to be quiet; there is necessarily, and within suitably defined areas, concomitant freedom not to speak publicly,

pg. 117 of 126

which freedom serves same ultimate end as freedom of speech in its affirmative aspect." Bartnicki V. Vopper, 532 U.S. 514, 121 S. Ct. 1753, 149 L. Ed. 2d 787, 14 Fla. L. Weekly Fed. S 254, 2001 Cal. Daily op. Service 4037, 2001 Colo. J. C.A.R. 2488, 2001 D.A.R. 4961, 167 L.R.R.M. (BNA) 2199, 143 Lab. Cas (CCH) ¶¶ 59221, 29 Media L. Rep. (BNA) 1737, 2001 U.S. Lexis 3815 (2001)

32.) "Where an official or municipality acts in direct response to protected expression, it can be held liable only if there was no probable cause to believe the expression was illegal." ← That is what the U.S. Supreme Court held in Lozman and what the 11th Circuit re-affirmed in De Martini.

33.) In following with the president of De Martini V. Town of Gulf Stream, 942 F. 3d 1277, 1239 (11th Cir. 2019); I have stated facts in my complaint and responce that make it plausible that: ① my expression of dissent and/or 'sit and wait' protest was protected by the First Amendment because I was expressing my dissent against my local police department in a legal and peaceful manner; ② that the defendants retaliatory declaration of a medical emergency (Baker Act) stopped, punished, and effectively chilled my expression of dissent and/or 'sit and wait' protest by declaring a false medical emergency; and ③ that my 'sit and wait' protest was the "but-for-cause" of the defendants retaliatory arrest through the Baker Act and in violation of Fla. Stat. § 394.463 (5)

pg. 118 of 126

34.) The retaliatory arrest/Baker Act in August of 2020 effectively chilled my speech, therefore I have presented more than enough evidence to show that my 'sit and wait' protest was the "but-for-cause" of the Baker Act arrest. In other words, that the motive to stop my protest and remove me from their property was the cause of declaring a medical emergency. The retaliatory Baker Act arrest would not have happened with reasonable officers acting in good faith and facing the same set of circumstances because reasonable officers acting in good faith would have just returned my property to me.

35.) The officers malice and false declaration of a medical emergency is shown by the lack of reports by the EMS transport personel and the LRMC Hospital Staff.

36.) "Governments may not prevent protest, punish the exercise of the right under the First Amendment Free speech clause to protest peacefully by arresting the demonstrators, nor unduly burden the right by forcing demonstrators to undergo excessive searches that violate the fourth Amendment. U.S.C.A. Const. Amends 1, 4" Amnesty Intern., USA V. Battle, United States Court of Appeals, Eleventh Circuit, February 23, 2009, 559 F. 3d 1170

37.) "Peaceful protest is an expressive activity that constitutes protected speech under the First Amendment. U.S.A. Const. Amend 1." Keating V. City of Miami, United States District Court, S.D. Florida, Miami Division, January 20, 2009, 598 F. Supp. 2d 1315

p.g. 119 of 126

38.) "...demonstration, a mode of expression that is often entitled to first Amendment protection. U.S.C.A. Const Amend 1" Shamloo V. Mississippi State Bd. of Trustees of Institutions of Higher Learning, United States Court of Appeals, Fifth Circuit, July 2, 1980, 620 F. 2d 516

39.) "Police officer's unlawful arrest of protestor for disorderly conduct without arguable probable cause violated protestor's protected First Amendment right to protest and film police conduct, since officer arrested protestor to stop him from filming police activities. U.S. Const. Amends 1, 4." Toole V. City of Atlanta, United States Court of Appeals, Eleventh Circuit, December 26, 2019, 798 Fed. Appx. 381

40.) "protection of First Amendment is not limited to pure speech, but extends instead to peaceful expression of views by marches, demonstrations or assemblies. U.S.C.A. Const. Amend. 1" Davis V. Francois, United States Court of Appeals, Fifth Circuit, May 28, 1968, 395 F. 2d 730

41.) "Although peaceful, orderly demonstrations cannot be restricted simply because they create disturbances, the time, place and manner of demonstrations are subject to reasonable regulation. U.S.C.A. Const Amend. 1" Davis V. Francois, United States Court of Appeals, Fifth Circuit, May 28, 1968, 395 F. 2d 730

42.) "Fear of serious injury cannot alone justify suppression of free speech and assembly. US.C.A. Const. Amend 1" U.S. V. National Treasury Employees Union, Supreme Court of the United States, February 22, 1995, 513 U.S. 454

43.) "Mere public intolerance or animosity cannot be basis for abridgment of constitutional freedoms of free assembly and association. U.S.C.A. Const. Amends. 1, 14." Coates V. City of Cincinnati, Supreme Court of the United States, June 1, 1971, 402 U.S. 611

P.g. 120 of 126

14, 14.") and fourteenth amendments do not permit State to make criminal the exercise of right of assembly simply because its exercise may be "annoying" to some people. U.S.C.A. Const. Amends 1, 14." Coates V. City of Cincinnati, Supreme Court of the United States, June 1, 1971, 402 U.S. 611

45) "To prove Causation, as element of §1983 First Amendment retaliation claim, a plaintiff must prove that his speech was the "but-for" cause of the allegedly retaliation action, which may be accomplished with proof of: ① an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory act, or ② a pattern of antagonism coupled with timing to establish a causal link. U.S.C.A. Const. Amend, 1; 42 U.S.C.A. §1983." Lozman V. City of Riviera Beach, U.S. District Court, S.D. Florida, August 19, 2014, 39 F. Supp 3d 1392.

46) If not for my 'sit and wait' protest officers would not have created excuses for arresting me. under the Baker Act

47) "In the absence of proof that the speech of a plaintiff asserting a First amendment retaliation claim under §1983 was the "but-for" cause of the allegedly retaliatory action, the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation. U.S.C.A. Const Amend. 1; 42 U.S.C.A §1983 Lozman V. City of Riviera Beach, U.S. District Court, S.D. Florida, August 19, 2014, 39 F. Supp 3d 1392.

48) "A plaintiff who brings a retaliation claim under §1983 predicated on the First Amendment must show: ① he or she engaged in constitutionally protected activity,

P.g. 121 of 126

② the defendant's responsive actions were motivated or substantially caused by the exercise of that right, that is, there was a causal connection between the protected activity and the retaliatory action, and ③ the defendant's retaliatory actions were sufficient to deter a person of ordinary firmness from exercising his or her Constitutional rights, that is, the defendant's action effectively chilled the exercise of the plaintiff's First Amendment right, U.S.C.A. Const Amend 1.; 42 U.S.C.A. § 1983." Lozman V. City of Riviera Beach, U.S. District Court, S.D. Florida, August 19, 2014, 39 F. Supp 3d 1392

49.) "Individual's participation in protest march was protected speech, as required for First Amendment retaliation claim. U.S.C.A. Const. Amend. 1" Battiste V. Lamberti, United States District Court, S.D. Florida, August 11, 2008, 571 F. Supp. 2d 1286.

# VIII.) Punitive Damages

I have stated a valid claim for Punitive damages against the defendants in their individual Capacities for direct and/or indirect involvement in maliciously declaring a medical emergency on 8/17/2020.

1.) In Section VI, P.g. 26 of the defendants motion to dismiss, the defendants state: "Punitive damages are not recoverable against a municipality, government entity or a political subdivision. This statement is correct.

2.) I (the Plaintiff) have **not** demanded Punitive damages from the City of Leesburg, FL.

3.) My demands for Punitive damages are against the Police officers in their individual capacities for their malicious action of falsely Baker Acting me on 8/17/2020.

4.) In Section VI, P.g. 26 of the defendants motion to dismiss, the defendants state: "Plaintiff has made no factual allegations regarding any conduct of **all** the named officers, Chief Iozzi and Lt. Romanelli that Plaintiff contends was even unlawful or outside the course and scope of their employment, let alone any allegations to support a claim that each officer acted with malice or reckless indifference as required to recover Punitive damages against them." This statement is False.

P.g. 123 of 126

5.) This entire complaint is based on the malicious action of the officers declaring a false medical emergency to stop and punish my 'sit and wait' protest at their police department.

6.) As I pointed out in Section D (II)(E) of this responce:

"Under this Section, any person who, under color of law, deprives another of his federal Constitutional rights is liable to the injured party at law or in equity, and if a person acts under color of law, it is irrelavant whether the official was acting within or without the Scope of his employment by common law standards." Smyth V. Lubbers, 1975 U.S. Dist. Lexis 11672, 398 F. Supp. 777 (W.D. Mich. 1975)

IX.) Conclusion

1.) Since the defendants acted in bad faith and with malicious intent when they falsely declared a medical emergency on 8/17/2020, this court should deny their motion to strike the punitive damages sought against the officers in their individual capacities.

2.) My amended complaint (Doc. 18) contains clear and specific pleadings that exceed the requirements of FRCP rules 8(a)(2), 10(b), and 12(b)(6). Therefore, this complaint is not a shotgun pleading.

3.) I have presented objective evidence that the LPD officers declared a medical emergency without even arguable probable cause in violation of both Fla. Stat. § 394.463(5) and my 4th Amendment rights, which is a clearly stated plausible claim for which relief may be granted.

P.g. 124 of 126

4.) The LPD officers acted with malice and in bad faith by falsely Baker Acting me without need for medical treatment, therefore neither the City nor the officers are entitled to immunity from suit in this Complaint.

5.) The request by the defendants for dismissal with prejudice or stricking the amended complaint (Doc. 18) should be rightfully **Denied.**

6.) My amended complaint (Doc. 18) is properly separated into sections and clearly articulated. The statement by the defendants that my complaint is a labyrinth of claims, counts, accusations, and repetition is completely False.

Wherefore, I (the Plaintiff) present this document as a responce to the motion to dismiss by the defendants whom are represented by Stephanie J. Brionez of Brionez & Brionez, P.A.. I ask this Court to permitt this case to Continue on to the discovery process. I thank you for your time and consideration.

## Certificate of Service

I hereby Certify that a true and correct Copy of this motion was given to ___Ms. Drew___ a mail clerk with the Florida Department of Corrections for U.S. Postal Mailing to the U.S. Middle District Court of Florida, Ocala Division, at 207 NW Second Street, Room 337, Ocala, FL 34475; and to Brionez & Brionez, P.A. Attn: Stephanie J. Brionez, P.O. Box 985, Tavares, FL 32778; and to Cole, Scott, and Kissane, P.A. Attn: Isabella Sanchez, 9150 South Dadeland Blvd., Suite 1400, P.O. Box 569015, Miami, FL 33256 on this __29th__ day of July 2025.

P.g. 125 of 126

Before me, the undersigned authority, on this day personally appeared, Angel E. Gastón, known to me, or proved to me on the basis of Florida Department of Corrections ID with number 020151, to be the person whose name is subscribed below, and under oath does present this responce.

_____     _____ 7/29/2025
Notary public                         Angel E. Gastón

Lea Drew
Print name of notary public

**LEA DREW**
Notary Public
State of Florida
Comm# HH640199
Expires 2/13/2029

HH640199     2/13/2029
serial/commission number

Respectfully Submitted,

Angel E. Gastón
Date: 7/29/2025
Sumter Correctional Institution
Cell# J2105 : DC# 020151
9544 CR 476 B
Bushnell, FL 33513

Pg. 126 of 126